Soquet vs. The State.

72 659
82 605

SOQUET, Plaintiff in error, vs. THE STATE, Defendant in error.

*October 18 — December 22, 1888.*

*Criminal law: Poisons: Qualifications of experts: Knowledge acquired from books: Reversal of judgment.*

1. A physician cannot testify as an expert as to the symptoms of arsenical poisoning, if his knowledge of the subject has been obtained wholly from medical or scientific books or medical instruction, and not from personal observation or experience.
2. Two physicians lacking the qualification of personal observation or experience having been permitted to testify as experts in behalf of the state on a prosecution for murder by poisoning, a judgment of conviction is reversed, although their testimony was supported by that of two competent experts.

ERROR to the Circuit Court for *Brown* County.

The case is stated in the opinion.

For the plaintiff in error there was a brief by *Hudd & Wigman*, and oral argument by *J. H. M. Wigman.* To the point that the opinion of an expert witness must be founded upon personal experience and not upon what he has read, they cited *Comm. v. Rich*, 14 Gray, 335; *Boyle v. State*, 57

Wis. 479; *State v. Klinger*, 46 Mo. 228; *Caleb v. State*, 39 Miss. 722; *Russell v. State*, 53 id. 368; *Luning v. State*, 2 Pin. 284, 288.

For the defendant in error there was a brief by the *Attorney General* and *L. K. Luse*, Assistant Attorney General, and *Chas. E. Vroman*, special counsel, and the cause was argued orally by *Mr. Vroman* and *Mr. Luse*. They contended, *inter alia*, that an expert may be competent although his knowledge is derived from study, without experience or observation. Bell's Expert Testimony, 12; Lawson's Expert Evi. 210; Roger's Expert Testimony, sec. 20; *Citizens' Gas L. & H. Co. v. O'Brien*, 19 Bradw. 231; *State v. Sheets*, 89 N. C. 543; *Central R. Co. v. Mitchell*, 63 Ga. 173; *State v. Cole*, 63 Iowa, 695; *Davis v. State*, 35 Ind. 496; *State v. Hinkle*, 6 Iowa, 386; *Castner v. Sliker*, 33 N. J. Law, 95, 507; *State v. Reddeck*, 7 Kan. 143; *Taylor v. G. T. R. Co.* 48 N. H. 304; *Dole v. Johnson*, 50 id. 452. The qualification of an expert is a question to be determined by the trial court, and its decision thereon is not subject to review except for an abuse of discretion. *Dole v. Johnson*, 50 N. H. 452; 1 Greenl. on Ev. sec. 440, note b; Lawson's Expert Evi. 236.

The following opinion was filed November 8, 1888:

ORTON, J. The information charged the plaintiff in error with having murdered his wife, Esperance Soquet, on the 13th day of June, 1873, by poisoning, and the trial was had in April, 1888. The evidence tended to prove the following facts: The plaintiff in error and one August Mainsort, in June, 1873, lived as neighbors, on farms one mile apart. The family of the plaintiff in error consisted of himself and his wife, Esperance, and seven children, and that of Mainsort consisted only of himself and wife; and a criminal intimacy appeared to exist between the plaintiff in error and the wife of Mainsort. Mainsort suddenly died, and on au-

topsy eight grains of arsenic were found in his stomach, and the plaintiff in error was present, with his wife, at his death, and superintended and took great interest in his speedy interment. In about ten days afterwards, Esperance, the wife of the plaintiff in error, died, and a short time after that event the plaintiff in error married the widow of Mainsort. Esperance Soquet was a strong and healthy woman, and had borne eight children without unusual trouble. She was confined and brought forth a child on Monday morning under normal conditions, and passed through it safely. Dr. Munro, of Green Bay, was her attending physician, and he testified substantially that there were no indications of disease resulting from her confinement; but that on Tuesday or Wednesday following a great change had taken place in her condition, and she was very sick, and many things present, together with her symptoms, excited his suspicion that she had been poisoned with arsenic, and he made a diagnosis of her case sufficient to satisfy him that she was suffering from some corrosive poison; and he made examination of the cooking utensils and other things for traces of poison, but found nothing. He then declined to treat her any further. In a very few days thereafter she died, and no autopsy was ever made to ascertain the cause of her death. Very soon after her death her body became black and much discolored. The plaintiff in error had been seen to give her mush, and to carry out of the room what was left of it, and to carry away the contents of her stomach by vomiting. The evidence, aside from these conditions observed by Dr. Munro and others, and from certain statements or admissions of the plaintiff in error, was circumstantial, and none of such admissions amounted to direct confessions. Over fourteen years had passed since the occurrence, and the events of that time and such statements, or many of them, depended upon the memory of witnesses. The trial resulted in a verdict of guilty of murder

in the first degree, and the plaintiff in error was sentenced to imprisonment for life.

The exceptions taken in behalf of the defendant at the trial are very numerous. But inasmuch as there may be no occasion for the same exceptions on another trial, we shall consider only such as are the most important and material, and upon which we are compelled to reverse the judgment of conviction.

The witness Dr. Munro made about the only diagnosis of the fatal sickness of the deceased, and he stated to the jury the various symptoms that came under his observation, and other witnesses testified to other symptoms and appearances. This witness having detailed the symptoms he had himself observed, was asked by the district attorney, "What are the symptoms of arsenical poisoning?" Objection was made by the counsel for the prisoner that the witness was not shown to be an expert. The court sustained the objection until the witness could be further examined as to his qualifications to testify as an expert. He was thereupon asked, "Are you a member of any medical society?" and the witness answered, "Yes." He was further asked, "Graduate of any medical college?" and he answered, "No." He was then asked, "What medical society are you a member of?" and he answered, "Brown county." He was asked, "How long have you been a member of that society?" and he answered, "Ten or twelve years." He was then asked, "How long has your practice as a physician covered?" and he answered, "Twenty-five or thirty years." He was then asked, "Has it covered cases of poisoning?" and he answered, "Not that I remember just now." He was then asked, "Have you made a study of that branch of practice as well as other branches, and in the same way?" and he answered, "Just in the same way. Yes." He was then asked: "State whether a knowledge of poisons and their effects is a part of the knowledge of a physician practicing?" and he an-

swered, "It certainly is." He was then asked, "You may state what are the symptoms of arsenical poisoning?" This question was again objected to by the counsel of the prisoner, as the witness had not shown himself qualified, and the objection was overruled, and the counsel of the prisoner excepted to such ruling. The witness thereupon answered, stating the symptoms and appearances he had observed in the sickness of the deceased, and testified to by others, as the symptoms of arsenical poisoning. He was then asked "what a livid appearance of the face indicated." This question was also objected to, and the objection overruled, and exception taken. The witness answered, "An unhealthy circulation of the blood for one thing." He was then asked, "In connection with the symptoms you have described, what would it indicate, if anything?" This question was also objected to, and the objection was overruled, and exception taken. The witness answered, "Well, it would just indicate that the whole circulative system was suffering from something unknown, and possibly what I was suspecting;" and under the same objection he testified that certain appearances he had described indicated arsenical poisoning or other poisoning. On cross-examination the witness, when asked, "Have you ever had a case of arsenical poisoning to treat yourself individually as a physician?" answered, "No;" and when asked, "Have you ever seen a person die, when you knew that he died from the effects of irritant poison — present at his death?" answered, "No;" and when asked, "Then all you know about what the symptoms of arsenical or irritant poisoning may be, is from theory, from your knowledge as a student of medicine?" answered, "And from books;" and when further asked, "And from reading scientific works upon that question?" answered, "Yes;" and when asked further, "Not from any practical observation of your own?" answered, "No."

Dr. Olmstead, offered as another medical witness and expert by the district attorney, testified that he was a phy-

sician, and had been a practicing physician a little over thirteen years, and had been in practice all of the time, and is still practicing, and was then asked by the district attorney, "Are you a member of any association?" and he answered, "Yes, a medical association, the Homeopathic State Society of Wisconsin." He was then asked, "Has your practice covered cases of poisoning at all?" and he answered, "I never had a case of it." He was then asked, "Has your course of study and investigation carried you into the examination of symptoms of poisoning and the effects of poison?" He answered, "Yes." He then testified that he had heard most of the testimony of Dr. Munro. An hypothetical question, claimed by the district attorney to contain and embrace all the symptoms testified to by Dr. Munro and other witnesses, which the deceased suffered in her last sickness, was addressed to the witness, and concluded with the questions: "What would you say was the matter with the patient?" and "What would be your diagnosis of the case?" This was objected to by the counsel of the prisoner, and the objection was overruled and exception taken, and the witness answered, "I should suspect that an irritant poison had been administered." He was asked, "What irritant poison?" and he answered, "Arsenic." He was then asked, "Well, from the symptoms as I have stated them, as compared with cholera morbus, which would you say the patient was suffering from?" and he answered, "I should say she was suffering from arsenical poisoning." On cross-examination the witness further testified that he had never seen a case of arsenical poisoning, and never treated one, or seen one in his practice, and that all he knows about it, in relation to the effects of an irritant poison, was what he got from books and authorities that he had read and consulted, and from what he was taught at the medical college, without any practical knowledge or experience aside from that.

The testimony of these two medical witnesses was very

material, if not indispensable, in proving an important element of the *corpus delicti*,—that the deceased came to her death by criminal means. Dr. Munro was her attending physician, and upon his diagnosis from actual observation of her symptoms depended all of the medical testimony in the case. The court, in instructing the jury, called their attention to the testimony of Dr. Munro particularly. It is true that there were two other medical witnesses who, in their practice, had each seen at least one case of poisoning by arsenic, who testified in answer to an hypothetical question embracing the symptoms testified to by others that such symptoms indicated arsenical poisoning, but we cannot say that the verdict would have been the same without the testimony of Doctors Munro and Olmstead, and that it was therefore immaterial. It seems to us that the jury must have relied very much on their testimony. It is both surprising and unfortunate that upon such a long, difficult, and expensive trial of a case of murder in the first degree, the result should have been hazarded upon such a question as that of the qualification of the medical witnesses to give an opinion that the symptons of the last sickness of the deceased indicated poison by arsenic, when their disqualification was so apparent in the light of a recent decision of this court. Neither Dr. Munro nor Dr. Olmstead had ever seen a case, or had any experience whatever on the subject of arsenical poisoning, and all that either of them knew upon the subject was derived from medical or scientific books and medical instruction. In receiving their testimony, the court committed and *repeated* the very error by reason of which the judgment in the case of *Boyle v. State*, 57 Wis. 472, was reversed. In that case, Dr. Cody was allowed to testify as to what medical books and authorities said upon the subject of "strangulation," and to give an opinion of its fatal effect and consequence, when he had testified that he had never seen a case of "strangulation," and that he

did not know by experience of it, and had no personal knowledge on the subject. That case was unusually well considered, and the logic of the opinion is perfectly conclusive, and numerous authorities are cited to sustain the decision. Many cases in this state and elsewhere are cited to show that medical works and authorities could not be read in evidence, and Mr. Justice TAYLOR well said: "Certainly, if the book itself cannot be read in evidence to the jury, the witness cannot be permitted to give extracts from it as evidence, depending upon his memory for their correctness. The palpable error in permitting Dr. Cody to testify is apparent from the fact that he testified on the stand that he had no personal knowledge on the subject he was testifying about. He says: 'I have not seen a case of *strangulation,* and do not know by experience.'"

I have quoted the testimony of Doctors Munro and Olmstead, by questions and answers, fully and correctly, that the application of *Boyle v. State* might clearly appear. The testimony of such medical witnesses is at best merely hearsay,— what medical books and teachers taught or told them, repeated from memory. The learned counsel of the state asks this court to review and overrule that case as not supported by authority. But it is supported by authority, and equally by reason. The decision was made deliberately, and we can see no reason for revising or changing it. It is to be deplored that it escaped the attention of the court and the counsel of the state in a case of such serious consequence. The result and consequence of such a palpable error must be the same as in the case of *Boyle v. State.* The judgment must be reversed. It is more important to the public and the state than the conviction of the prisoner, that he be convicted, if at all, on legal and competent evidence. It would seem not to be difficult to find a sufficient number of medical witnesses to testify in such a case, who are competent from knowledge and experience.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial. The warden of the state prison will surrender the plaintiff in error to the sheriff of Brown county, who will hold him in custody until he shall be discharged by due course of law.

A motion for a rehearing was made by the defendant in error, and it was urged that the case of *Boyle v. State*, 57 Wis. 472, is clearly distinguishable from this case. The question here is not whether an expert witness may testify as to what an author says, but whether a person may become an expert on any given subject by close attention and discriminating study of that subject, together with practical experience in a profession of which that subject is a part. That a witness may testify from knowledge so acquired, see, besides cases cited on the former argument, *Tullis v. Kidd*, 12 Ala. 648; *State v. Terrell*, 12 Rich. 321; *Bierce v. Stocking*, 11 Gray, 174; *State v. Baldwin*, 36 Kan. 1–16. The extent of the special knowledge to be required of an expert is so much a matter of discretion with the trial court that its decision should be disturbed only when the witness is shown to be wholly incompetent. *Ardesco Oil Co. v. Gilson*, 63 Pa. St. 146; *Spring Co. v. Edgar*, 99 U. S. 645–648; *Tucker v. M. C. R. Co.* 118 Mass. 546; *Nelson v. Sun Mut. Ins. Co.* 71 N. Y. 453; *Ft. Wayne v. Coombs*, 107 Ind. 75; *Warren v. Spencer Water Co.* 143 Mass. 9; *Perkins v. Stickney*, 132 Mass. 217; *Howard v. Providence*, 6 R. I. 514; *Bemis v. C. V. R. Co.* 58 Vt. 636; Best on Evi. (Morgan's Notes), sec. 513, p. 868, note 3, p. 876, note 1, and p. 882, per MILLER, C. J.

Counsel for the plaintiff in error cited, besides cases previously cited by them, *Polk v. State*, 36 Ark. 117; Bouvier's Law Dict. tit. EXPERT; *Nelson v. Sun Mut. Ins. Co.* 71 N. Y. 460.

The motion was denied December 22, 1888.