## WILLIAM B. SIEBERT *et al.*

### *v.*

### THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa October 31, 1892.*

1. JURY—*when clerk may draw jurors to fill regular panel.* If, for any reason, during the term, the regular panel of jurors shall not be full, the clerk may draw as many jurors as the court may direct to fill the panel, and the jurors so drawn are required to be summoned. When the regular panel is full, but is exhausted by challenges in a case on trial, the clerk is not authorized by the statute to draw jurors from which to complete the jury in the case. In such case it is the duty of the court to direct the sheriff to summon a sufficient number of persons having the qualifications of jurors, to fill the panel for the trial of the pending cause.

2. SAME—*irregularity in selecting—when no reversible error.* On the trial of one for murder, after the regular panel of jurors was exhausted, the court ordered the clerk to draw one hundred jurors from whom to fill the trial panel, instead of directing the sheriff to summon a sufficient number of persons to fill such panel : *Held,* as no prejudice to the defendant was shown to result from the mode of selecting the jurors, the irregularity was not such an error as to require a reversal of the judgment of conviction.

3. EVIDENCE—*competency of medical expert.* A licensed, practicing physician who is shown to be a graduate of a regular medical college, and to have practiced his profession for many years, is competent to give his opinion, upon an hypothetical question setting forth the symptoms of a person immediately prior to his death, whether the death was from the effects of arsenical poison, although he may not be shown to have had any case of such poisoning. A medical witness, in giving his opinion as an expert, is not confined to opinions derived from his own observation and experience, but may give an opinion based upon information derived from medical books.

4. SAME—*admission of improper evidence—when no ground of reversal.* Where there is ample proper evidence to establish a fact, the admission of improper evidence which is merely cumulative and which works no harm is not sufficient ground for a reversal.

5. SAME—*letters and papers of a party unlawfully obtained.* Although letters or papers may be unlawfully, and by artifice and deceit, obtained by a detective from the possession of a party charged with crime, this will afford no valid objection to their admissibility in evidence against him, if they are otherwise competent and pertinent.

6. Same — *hearsay — declarations of a deceased person.* On the trial of a wife and her paramour for the murder of her husband by administering to him poison, declarations of the deceased made at different times within a year before his death, and prior to his last sickness, that he intended to take his own life, not accompanied by an act of the deceased which they might explain, being mere hearsay, are not admissible on the part of the defense.

7. Same —*offer of vial and box embraces contents.* Where a vial and box containing poison are offered in evidence and admitted, the manifest object of offering them in evidence being to get the contents to the jury, an instruction to the jury not to consider the contents is properly refused.

8. Former decisions—*as to the credibility of party as a witness in a criminal case.* The case of *Purdy* v. *People,* 140 Ill. 46, in passing upon the rule for testing the credibility of a defendant in a criminal case when he becomes a witness in his own behalf, was not intended to overrule the cases of *Hirschman* v. *People,* 101 Ill. 568, and *Rider* v. *People,* 110 id. 11, and there is no conflict in the *Purdy case* and the others named.

9. Practice — *remarks of counsel in closing argument.* On a trial of two persons for murder, committed by poison, the State's attorney, in his closing argument, told the jury that they had frequently heard it said, and perhaps so said themselves, that crime goes unpunished in this country, and called their attention to other poisoning cases in the same city, and said that the defendants thought they could "repeat that operation;" that they could remove the deceased by arsenic just as those other persons had done; that you can not convict in such cases; that they thought they could get the deceased buried before any one could discover what was the matter with him, etc.: *Held,* that the remarks were not such as to call for a reversal of a judgment of conviction.

10. In such a case, the State's attorney has the right to call upon the jury to sustain the laws, and if it is a matter of notoriety in the community that crime had gone unpunished, he may properly speak of that fact. As a general rule, the argument to the jury should be confined to the evidence, but by way of illustration known facts may be referred to in argument.

11. Instructions—*calling attention to a part of the evidence.* On the trial of a wife and her paramour for poisoning her husband, it appeared in the evidence that the defendants, for several years before, had been guilty of adultery. The court instructed the jury that the evidence of adultery was admissible, not for the mere purpose of proving that the man had been guilty of adultery with the wife of deceased, but such proof was admissible on the question of motive : *Held,* that the instruc-

tion did not improperly call the attention of the jury to a particular part of the evidence.

12. SAME— *abstract proposition—no evidence to call for it.* On the trial of a man and woman for the murder of the woman's husband, an instruction as to the law relating to principal and accessory, not objectionable as an abstract proposition of law, may be properly given where there is evidence which might lead the jury to believe that one of the defendants administered the poison to the deceased, and the other stood by aiding and encouraging the act.

13. CRIMINAL LAW—*instruction as to reasonable doubt.* On the trial of a criminal case it is not error to instruct the jury that it is not necessary to prove each link in the chain of circumstances relied on, or every fact in the case, beyond a reasonable doubt, but it is sufficient if, taking the evidence as a whole, they are satisfied, beyond a reasonable doubt, of the defendant's guilt.

14. WITNESS—*credibility of party as witness in criminal case.* Where the defendants in a criminal case become witnesses in their own behalf, it is proper to instruct the jury that they become the same as other witnesses, and their credibility is to be tested by and subjected to the same tests as are legally applied to any other witnesses, and that in determining the degree of credibility to be accorded to their testimony the jury have the right to take into consideration the fact that they are interested in the result of the prosecution, as well as their demeanor and conduct upon the witness stand, and the jury are to take into consideration the fact, if such is the fact, that they have been contradicted by other witnesses.

15. SAME —*impeachment—instruction.* Where the defendants in a criminal case testify in their own behalf, it is not error to instruct the jury, that if, after considering all the evidence in the case, they find that the accused have willfully and corruptly testified falsely to any fact material to the issue in the cause they have the right to disregard their testimony, excepting in so far as it is corroborated by other credible evidence or facts and circumstances proven in evidence in the case.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon. HENRY B. WILLIS, Judge, presiding.

Messrs. ALSCHULER & MURPHY, and Mr. J. A. RUSSELL, for the plaintiffs in error:

The jury was improperly drawn by the clerk. Rev. Stat. chap. 78, sec. 13.

This was reversible error. *Lincoln* v. *Stowell,* 73 id. 246; *Hanna* v. *People,* 86 id. 243.

The court erred in admitting improper expert evidence. *Boyle* v. *State,* 57 Wis. 472; *Russell* v. *State,* 53 Miss. 367; *Commonwealth* v. *Rich,* 14 Gray, 353.

It was error to admit in evidence the letters, which had been unlawfully taken by the detective. *Boyd* v. *United States,* 116 U. S. 616.

Evidence of the declarations of the deceased showing an intention to take his own life, was improperly refused admission. *Blackburn* v. *State,* 23 Ohio St. 146; *Regina* v. *Johnson,* 2 C. & K. 354; *Wiggins* v. *People,* 3 Otto, 465; 1 Archbold's Crim. Pl. and Pr. 811; Wharton's Crim. Ev. sec. 757; *People* v. *Scoggins,* 37 Cal. 670; *Pritchett* v. *State,* 22 Ala. 42; *Holter* v. *State,* 37 Ind. 57; *Keener* v. *State,* 18 Ga. 194; *Turpin* v. *State,* 77 N. C. 473; *Campbell* v. *People,* 16 Ill. 17; *Kunde* v. *State,* 22 Texas App. 96; *Morgan* v. *Commonwealth,* 14 Bush. 106; *Sawyers* v. *State,* 15 Lea, 694.

As to the improper remarks by the State's attorney, see *Fox* v. *People,* 95 Ill. 71; *State* v. *Smith,* 75 N. C. 306; *Yoe* v. *People,* 49 Ill. 410; *Kinnahan* v. *Kinnahan,* 71 Ind. 418; *Angelo* v. *People,* 96 Ill. 209; *Jackson* v. *People,* 18 Bradw. 508; *Earll* v. *People,* 99 Ill. 123; *McDonald* v. *People,* 126 id. 150.

The People's third instruction is erroneous in selecting particular parts of the evidence and directing the attention of the jury to it. *Hatch* v. *Marsh,* 71 Ill. 370; *Homes* v. *Hale,* id. 555; *Hewett* v. *Johnson,* 72 id. 513; *Calef* v. *Thomas,* 81 id. 478.

Instructions as to credibility should not be directed against any particular witness. *Insurance Co.* v. *LaPointe,* 118 Ill. 384; Thompson on Trials, sec. 2421; *Devlin* v. *People,* 104 Ill. 504; *Wight* v. *Bell,* 5 Bradw. 352; *Byrne* v. *Hartshorn,* 21 Ill. App. 643.

Mr. GEORGE HUNT, Attorney General, Mr. FRANK G. HAN-CHETT, State's Attorney, and Messrs. HOPKINS, ALDRICH & THATCHER, for the People:

The letters obtained from Siebert by the detective were competent and proper evidence. *Commonwealth* v. *Dana*, 2 Metc. 329; *Jordan* v. *Lewis*, 2 Strange, 1120; *Legatt* v. *Tollervey*, 14 East, 302; *Gindrat* v. *People*, 138 Ill. 103; Greenleaf on Evidence, (Redf. ed.) sec. 254.

A practicing physician, being a graduate of a medical college, may give his opinion founded upon his reading, alone. Rogers on Expert Testimony, sec. 102; Rapalje on Law of Witnesses, secs. 293, 295; *State* v. *Clark*, 12 Ired. 151; *State* v. *Wood*, 53 N. H. 484.

As to the admissibility of the declarations of the deceased or his threats of suicide, see 1 Bishop on Crim. Proc. secs. 1081, 1082; 2 id. sec. 623; Wharton on Homicide, sec. 603; Roscoe on Crim. Ev. 52; *Kennedy* v. *People*, 39 N. Y. 253; *People* v. *McLaughlin*, 44 Cal. 435; *State* v. *Dart*, 29 Conn. 153; *State* v. *Wood*, 53 N. H. 484; *Commonwealth* v. *Densmore*, 12 Allen, 535; *Williams* v. *State*, 52 Ala. 411; *State* v. *Maitremme*, 14 La. Ann. 842; *State* v. *Fore*, 37 id. 443; *Commonwealth* v. *Felch*, 132 Mass. 32; *People* v. *Williams*, 3 N. Y. 596; Wharton on Crim. Ev. sec. 757.

As to irregularity in selecting or drawing jurors, see *State* v. *Carney*, 20 Iowa, 82; *Beasley* v. *People*, 89 Ill. 571; *Stone* v. *People*, 2 Scam. 326; *Murphy* v. *People*, 37 Ill. 447; *Insurance Co.* v. *Nelson*, 75 id. 548; *Wilson* v. *People*, 94 id. 299; *Ochs* v. *People*, 24 Ill. App. 391; *Railroad Co.* v. *Lux*, 63 Ill. 523; *Mapes* v. *People*, 69 id. 523; *People* v. *Madison County*, 125 id. 334.

As to the alleged improper remarks of the State's attorney, see *Bradshaw* v. *State*, 17 Neb. 147; *McLean* v. *State*, 18 Neb. 154; *Wilson* v. *People*, 94 Ill. 327; *Garrity* v. *People*, 107 id. 168; *Spies* v. *People*, 122 id. 266; *Bulliner* v. *People*, 95 id.

405; *Duffin* v. *People,* 107 id. 113; *Sanders* v. *People,* 124 id. 225; *Ochs* v. *People,* id. 430; *Epps* v. *State,* 102 Ind. 539; *Watt* v. *People,* 126 Ill. 30; *Ferguson* v. *State,* 49 Ind. 33; Hilliard on New Trials, 225.

Mr. Justice Craig delivered the opinion of the Court:

The trial of the defendants on an indictment for murder commenced on the 21st day of October, 1891, and on that day there was present a full panel of jurors drawn, as prescribed by statute, before the first day of the term of court. On the 22d day of October the regular panel of jurors was exhausted on account of challenges in the selection of a jury for the trial of the defendants, and the court ordered the clerk to draw the names of one hundred additional jurors from the jury box, returnable forthwith. The defendants excepted to the order, and upon the return of the venire for the jurors drawn, they entered a motion to quash the venire, claiming that the clerk had no authority, under the statute, to draw the jurors,—that when the regular panel has been exhausted, jurors should be summoned by the sheriff. The defendants also challenge the array of jurors so drawn. Upon two subsequent days, when the jurors so drawn had been exhausted, similar orders were entered, additional jurors drawn, and similar motions made and overruled.

Section 8, chapter 78, of our Revised Statutes, provides: "At least twenty days before the first day of any trial term of any of said courts, the clerk of such court shall repair to the office of the county clerk, and in the presence of such county clerk * * * draw from said box the names of a sufficient number of said persons, * * * not less than thirty for each two weeks that such court will probably be in session for the trial of common law cases, to constitute the petit jurors for the term." Section 10 provides the manner in which the jurors so drawn shall be summoned. Section 12 provides as

follows: "If for any reason the panel of petit jurors shall not be full at the opening of such court or at any time during the term, the clerk of such court may again repair to the office of the county clerk and draw, in the same manner as at the first drawing, such number of jurors as the court shall direct, to fill such panel, who shall be summoned in the same manner as the others, and, if necessary, jurors may continue to be drawn and summoned from time to time until the panel shall be filled. Section thirteen provides, that "when, by reason of challenge in the selection of a jury for the trial of any cause, or by reason of the sudden sickness or absence of any juror for any cause, the regular panel shall be exhausted, the court may direct the sheriff to summon a sufficient number of persons having the qualifications of jurors, to fill the panel for the impending trial; but upon objection, by either party to the cause, to the sheriff summoning a sufficient number of persons to fill the panel, the court shall appoint a special bailiff to summon such persons."

It is claimed on behalf of the People that the jury was properly selected under section 12, *supra.* It seems to be plain from the language of the section of the statute relied upon, if for any reason during the term of court the panel of jurors shall not be full, the clerk of the court may draw such number of jurors as the court may direct, to fill the panel, and the jurors so drawn are required to be summoned by the sheriff. But in the case under consideration the emergency which authorized the clerk to draw jurors had not arisen. Jurors had been excused from serving on the case on trial, but they were still members of the regular panel, attending court in the capacity in which they had originally been selected. The regular panel of jurors had not been depleted or diminished, but it was full. It therefore seems plain that a case had not arisen under which the clerk of the court was called upon to act under section 12 of the act. But on the other hand, in the selection of a jury for the trial of the case from the regular panel, on ac-

37—143 ILL.

count of challenge of jurors, the regular panel was exhausted, and being exhausted, under section 13 it was the duty of the court to direct the sheriff to summon a sufficient number of persons having the qualifications of jurors, to fill the panel for the trial of the cause then on trial. The regular panel of jurors was in attendance, ready at any moment to serve as jurors when called upon. But they had been called as jurors in the pending case and found not qualified, and had been excused. The regular panel having in this way been exhausted, the statute then required the court to direct the sheriff to summon a sufficient number of persons having the qualifications of jurors, to fill the panel for the impending trial.

But while the action of the court was irregular and not in strict conformity to the statute, is the irregularity one which has injured the defendants, and one which should result in a reversal of the judgment? It is not claimed that the jury selected in the mode it was selected was prejudiced against the defendants, or that they were not fair-minded men, and of sufficient intelligence to faithfully and intelligently discharge their duties as jurors, but, on the other hand, the jury seemed to be satisfactory to the defendants when taken. The defendants, in the selection of the jury, did not exhaust but a little more than one-half of their peremptory challenges. No one of the jurors selected was forced upon the defendants, but they were all voluntarily accepted. Indeed the only complaint now made is, that the jury was not selected in the technical mode required by the statute, and for that reason, and that alone, the judgment should be reversed. We can not concur in that view. While the statute was not strictly followed in the selection of a jury, and the record fails to show that the rights of the defendants were impaired, or that defendants were in any manner prejudiced, we can not hold that the irregularity should result in a reversal of the judgment. (*Mapes v. The People,* 69 Ill. 523; *The People v. Madison County,* 125 id. 339.) In the case last cited the array was challenged

on the ground that they had not been drawn by the clerk, as required by statute, but had been selected by the sheriff. It is there said : "If it be assumed that the jury was obtained irregularly, a challenge to the array will not be sustained where it is not also shown that a positive injury has been sustained in consequence of the refusal of the court to quash the panel." See, also, *Ferris* v. *The People,* 35 N. Y. 125.

It is next claimed that the court erred in allowing Dr. S. C. Gillett and Dr. C. L. Smith to testify as experts on the subject of arsenical poisoning. Dr. Gillett, as to his qualifications as an expert, testified that his profession was that of physician and surgeon ; that he was a graduate of Rush Medical College of Chicago ; that he had been a practicing physician in Aurora for thirty-four years, and that he was a licensed practitioner under the laws of the State of Illinois. An hypothetical question was then put to him by the prosecution, setting forth the symptoms of the deceased, and he was asked from what cause, in his opinion, the deceased came to his death. This was objected to by both of the defendants, on the ground, among others, that the witness did not properly qualify as an expert, which objection was overruled, the defendants excepting. The witness then testified, in substance : "If I found arsenic then I should expect he died from the effects of arsenic." The testimony of the other witness did not differ materially from the evidence of Gillett, except that he had been in practice but twelve years.

It will be observed that the two witnesses were both graduates of medical colleges, and that they were engaged in general practice and had been for a number of years. Whether they had ever had any experience in a case of poisoning in the practice does not appear from their examination. It is insisted that it devolved on the prosecution to show that the witnesses had, in their practice, had a case of arsenical poisoning before they could testify. This is a question upon which the authorities are not entirely harmonious. In *The State* v.

*Terrell*, 12 Rich. (S. C.) 321, on an indictment for murder produced by poison, the same objection was interposed to certain witnesses called by the prosecution as has been raised in this case, but the court held that medical witnesses, in giving their opinions as experts, are not confined to opinions derived from their own observation and experience, but may give opinions based upon information derived from the books. In *Mitchell* v. *The State*, 58 Ala. 417, which was an indictment for murder by poisoning by arsenic, a physician was allowed to give his opinion as to the cause of death, although it did not appear that he had ever attended cases of that character, and in passing on the admissibility of the evidence the court held that a physician who has had long experience in the practice of his profession, and knowledge of the symptoms of the malady of the deceased, is competent to testify as an expert. In *The State* v. *Wood*, 53 N. H. 484, which was an indictment for murder caused by an abortion alleged to have been produced by the defendant, it was held that a physician testifying as an expert may give an opinion founded upon his reading and study, alone.

Counsel for plaintiffs in error have cited *Tognet* v. *The State*, 72 Wis. 659, as an authority to sustain their position. In that case it was held that a physician can not testify as an expert as to symptoms of arsenical poisoning if his knowledge of the subject has been obtained wholly from medical books or medical instruction, and not from personal observation or experience. Upon looking into the case, however, it will be found that neither of the witnesses was a graduate of a medical college. There was no *post mortem* of the deceased. There was no chemical analysis of the stomach or any of the organs of the deceased. The death had occurred fifteen years before the trial, and the cause of death was a question in dispute. Under such circumstances it was held that the two physicians could not testify as experts to the symptoms of arsenical poisoning. The case differs in its facts so widely from the case

under consideration that we do not regard it as an authority here.

*Boyd* v. *Stokes*, 57 Wis. 472, has also been cited, but in that case it was held that medical books can not be introduced in evidence, nor can an expert witness testify to statements made therein, and it is also inadmissible to permit the reading of such books to the jury.

*Emerson* v. *Lowell Gas Light Co.* 6 Allen, 146, has also been cited as an authority. The action was one brought to recover damages for an injury to plaintiff's health, caused by an accidental escape of gas. On the trial a witness was called as an expert, but it appeared that he had no experience as to the effects upon the health of breathing illuminating gas. He was merely a physician who had been in practice several years, and the court held that he was not qualified to testify as an expert, and this ruling was affirmed in the Supreme Court. In the decision it is said: "The mere fact that he was a physician would not prove that he had any knowledge of gas, without further proof as to his experience, for it is notorious that many persons practice medicine who are without learning, and a physician may have much professional knowledge without being acquainted with the properties of gas or its effect on health." What was said in the case cited can not apply to a case of this character. An ordinary physician might not be acquainted with the properties of gas or its effect on health, but a physician of but slight experience would have no difficulty in telling the effect likely to result from taking into the stomach a deadly poison.

Without, however, extending the discussion of the question any further, we are inclined to hold that the opinions of the witnesses, founded on their practice, were competent evidence. What weight, however, should be given to the evidence was a question for the jury. Moreover, in this case it is apparent that the defendants were not injured, in the least, by the admission of the evidence. The cause of the death of Edwin N.

Kelchner was not a disputed question. Several physicians who were conceded to be qualified to testify as experts, testified that in their opinion the deceased came to his death from the effects of arsenic. Dr. Robbins, who assisted in the *post mortem* examination, testified to the condition of the stomach and other organs of the deceased, and Prof. Haines testified that he made a chemical analysis and found several grains of arsenic. The quantity of arsenic found in the system of the deceased was proven to be sufficient to kill several persons. No attempt was made on the trial to prove that the deceased came to his death from any other cause. The fact, therefore, that the deceased came to his death from arsenic was so clearly established by unimpeachable evidence, that the admission in evidence of the opinions of the two witnesses could have no prejudicial effect on the rights of the defendants, and we can not hold that its admission was error.

The next error relied upon is the admission in evidence of three certain letters written by Mrs. Kelchner, the wife of the deceased, to the defendant Siebert, which were found in Siebert's room, in his bureau drawer, by Pinkerton, a detective. The introduction of the letters in evidence was objected to, on the ground that they were obtained by unlawful seizure, in violation of the rights of the defendant Siebert, and reliance is placed on the case of *Boyd* v. *United States,* 116 U. S. 616.

The deceased and his family, at the time of his death, were occupying a house belonging to Siebert. The latter also occupied rooms in the same house. Pinkerton, after Siebert's arrest, conceived the plan of making an examination of Siebert's rooms. He called at the house, and, by representing to Mrs. Kelchner that he was acting as her friend, gained admission to Siebert's rooms. He found some of the bureau drawers locked, but obtained keys and opened the drawers, where he found the letters which he carried away. These are, in brief, the facts under which the letters were obtained.

It may be that these letters were obtained by the detective by artifice, and perhaps unlawfully. But however that may be, we do not find it necessary to enter upon an elaborate discussion of the admissibility of the evidence, as we have recently had occasion to go over the same question in *Gindrat* v. *The People*, 138 Ill. 103, and we think the decision in that case settles the question involved here. After citing several cases it is said: "We think that the cases last cited, as well as the present case, are clearly distinguishable from *Boyd* v. *United States*. In the latter case, the unconstitutional and erroneous order, process and procedure of the trial court compelled the claimants to produce evidence against themselves, and such order, process and procedure were also held to be tantamount to an unreasonable search and seizure; while here, and in other cases cited, the question of illegality was raised collaterally, and the court exercised no compulsion whatever to produce evidence from the defendants, and neither made orders nor issued process authorizing, or purporting to authorize, a search of the premises or a seizure of property or papers, but simply admitting evidence which was offered, without stopping to inquire whether possession of it had been obtained lawfully or unlawfully. Courts, in the administration of criminal law, are not accustomed to be over-sensitive in regard to the sources from which evidence comes, and will avail themselves of all evidence that is competent or pertinent, and not subversive of some constitutional or legal right. In Greenleaf on Evidence, (Redf. Ed.) sec. 254, it is said: 'Though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice how they are obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question.' We think that the admission of the jewelry in evidence in this case was in violation of no constitutional

right of plaintiffs in error, growing out of the tortious means by which DeSell got possession of it. They voluntarily admitted, both prior to and at the trial, their former possession of it, and at the trial testified before the jury in explanation of such possession."

The next point relied upon by the defendants to reverse the judgment is, that the court erred in refusing to allow the defendants to prove that the deceased, at different times within a year of his death, and prior to his last sickness which resulted in his death, made threats that he intended to take his own life,—that he intended to commit suicide. It will be observed that the declarations offered as evidence were not a part of the *res gestæ,* or accompanied by any act of the deceased which they might characterize or explain, but were mere naked declarations offered as original evidence. It is conceded in the argument, and fully established by the evidence that the deceased came to his death from arsenical poisoning, and while it is true that it was a question for the jury to determine, from the evidence, whether the deceased came to his death from poison administered by the defendants, or administered by himself or some other person, yet that question was one which must, like all other issues involved in the trial of a legal proceeding, be settled by legal and competent evidence introduced by the respective parties.

Counsel for plaintiffs in error have cited some authorities which seem to sustain their position, but we think the great weight of authority establishes the rule that such declarations are mere hearsay, and as such are not admissible.

Bishop, in his work on Criminal Procedure, (vol. 2, sec. 623,) after stating that the deceased is not a party to the prosecution and his utterances are hearsay, says: "The declarations of the deceased, as of any other third person, when not of the *res gestæ,* or dying declarations, or communicated to the defendant so as possibly to influence his conduct, are excluded by rules which have been supposed to promote justice

on the whole,—at all events, which have become parts of the common law, not within the discretion of the courts to set aside. Hence they are not admissible."

In *Kennedy* v. *The People*, 39 N. Y. 253, which was an indictment for homicide, where it was proposed to prove the declarations of the deceased to the effect that he had no money, the court said : "The question whether the deceased had or had not money in his possession at the time of his death, was, no doubt, a material one, as will presently be considered, and it may have been material to show that the prisoner was aware that the deceased had money. But the declaration of the deceased some weeks before the murder was not competent evidence that he had no money. It was no more evidence, as against the People or for the prisoner, than his declaration upon any other subject would have been. I know of no rule which makes the declarations of the deceased, forming no part of the *res gestæ*, competent evidence either for or against either party. It is in no analogy to dying declarations, which are received, when made in view of approaching death, as having a sanction equivalent to testimony given under the solemnity of an oath before the court and jury."

In *The State* v. *Dart*, 29 Conn. 153, on indictment for murder, it appeared that the deceased, an aged woman, was found lying on her face in a pool of water near her residence. The defendant resided with her as a hired man, there being no other member of the family. The defense was that the deceased was subject to fits, and had fallen into the pool of water in a fit, and in support of this theory defendant offered to prove the declarations of the deceased, made a year before, that she was subject to fits and had several times fallen on her face in a fit. The court said : "Hearsay evidence is not admissible merely because in the particular case none better can be had."

In *The State* v. *Wood*, 53 N. H. 484, where the defendant was charged with murder by producing an abortion it was

proven that the deceased had visited the office of another physician, and the defendant then offered to prove the declarations of the deceased made on leaving the other doctor's office. The court held the evidence inadmissible, and in deciding the case said: "The evidence offered was the merest hearsay in the world. They were not dying declarations, nor were they connected with any fact that alone had any connection with the case on trial. The case of *Patten* v. *Ferguson et al.* 18 N. H. 528, would seem to settle this question. The fact was of no importance standing alone, and the declaration, standing alone, was incompetent. When they are united the unimportant fact is used as a vehicle to introduce the incompetent declaration. * * * The theory that such a declaration can be valid and made competent by connecting it with a fact utterly immaterial to the cause, does not need authorities to refute it."

*Commonwealth* v. *Felch*, 132 Mass. 22, is another case in point. There the defendant was indicted for murder, resulting from abortion produced by him. It was claimed by the defendant that the deceased had performed the operation on herself, and in support of his position he called a witness, and offered to prove that a short time before the alleged offense the deceased told her that she was pregnant by one Titcomb, and that if Titcomb did not perform an operation to procure a miscarriage, or get some one to do so, she should perform the operation on herself with a lead pencil. The trial court refused to admit the offered evidence, and the Supreme Court, in disposing of this question, held that the evidence was hearsay, and inadmissible. It is there said: "The evidence tendered by the defendant in this case is what is recognized as hearsay evidence. Such evidence is generally inadmissible. There are, however, several exceptions to this rule, and it is contended by the defendant that this evidence may properly be brought within some one of them. The only exception particularly designated is that relating to a pedigree. This is

indeed one of the well recognized exceptions to the general rule. That which is technically hearsay evidence is competent evidence upon a question of pedigree. It is not easy to see how any question of pedigree can be involved in this case. * * * The fact that the purposes and intentions of the deceased would be, if known, a material aid in coming to a correct conclusion, does not permit such purposes and intentions to be founded upon incompetent evidence. Indeed, the more important the fact to be proven, the more important it is that it be proved by proper evidence. If the fact was established that the defendant and the deceased had made an agreement that the defendant should perform the operation referred to, it would be a most important and material fact, and would have a strong tendency to establish the defendant's guilt. But the same question occurs, how shall the fact be established? Pedigree is as much involved in the desire of the deceased that the defendant should commit the act, as in her desire that Titcomb should commit it or that she should do it herself. Perhaps in this may be found a satisfactory test of the competency of the testimony. If the government had called Hughes, and offered to prove by her that the deceased had told her in June that she was pregnant by the defendant and he had agreed to perform the operation, would it be contended that the fact thus offered to be established could be proved by that evidence? There is no claim that the evidence is admissible under any other specific exception to the rule excluding hearsay. There is no pretense that it was a dying declaration, so as to make it necessary to consider the principle upon which such declarations are admissible. It accompanied no act. It gave character to no transaction. There existed no one of the circumstances which sometimes in law are deemed a sanction equivalent to the ordinary sanction of an oath. It is mere recital. The only apparent objection to the rejection of the evidence is this: The fact, if true, is an important fact; the deceased knew whether it was true or not; being

now dead she can not speak; in her lifetime she said it was true. The same suggestion may be made in reference to every fact material to any issue afterwards tried, known to any person deceased at the time of the trial, and this alone is sufficient to establish the wisdom of the rule." See, also, *Regina* v. *Wainwright*, 13 Cox Cr. Cases, 171; *The State* v. *Dula*, 45 N. C. 211; *The People* v. *Carkhuff*, 24 Cal. 640.

The decision in *Commonwealth* v. *Felch* applies here. The offered evidence was mere hearsay, it was not a part of the *res gestæ;* it was not a dying declaration; it accompanied no act of the deceased; it characterized no transaction, and we are aware of no well established principle upon which it was admissible.

We are reminded, however, that *Commonwealth* v. *Felch*, *supra*, has been overruled by the late case of *Commonwealth* v. *Trefethen*, 31 N. E. R. 961. In that case the court held that the declaration of an unmarried woman pregnant with child, declaring her intention to commit suicide, made the day before her death, was admissible on the trial of one accused of her murder. This decision, although rendered by a court of high standing, we do not regard in harmony with the current of authority, and we are not inclined to follow it. If a declaration of that character was accompanied with any act tending to show an intent to commit suicide, it might be admissible in connection with the act. But no act was attempted to be proven. Indeed, the arsenic found in the stomach of the deceased was proven to have been administered to him within from two to four hours of his death, at a time it was utterly impossible for the deceased to procure or take the poison himself.

The case of *Boyd* v. *The State*, 14 Lea, (82 Tenn.) 161, has been cited and relied upon by counsel for defendants. What was said by the court in deciding the case would seem to sustain the position of counsel, but upon an examination of the case the question there involved will be found to differ so

much from the question presented by this record, that the case can not be regarded as an authority here. In that case there had not only been threats, but an actual attempt, to commit suicide, and the evidence which had been excluded by the trial court contained not only a threat but an act of the deceased to commit suicide. Whether a mere threat, unaccompanied with an act, was admissible as evidence, was not raised or decided by the court.

*Blackburn* v. *The State*, 23 Ohio St. 146, has also been cited by counsel for defendants. In that case the defendant offered to prove that the deceased, six years before her death, was of a melancholy disposition of mind, and had threatened to commit suicide. The only objection made to the evidence in the trial court was, that it occurred at too remote a period. The question was not raised as to the admissibility of a bare threat. The offer was to prove melancholy and threats together, and it was insisted, as before stated, that the time was too remote, but the court held that it was not. That case can not control here.

Counsel for defendants have cited numerous cases where self-defense is relied upon to justify the homicide, on a trial under an indictment for murder, holding that the defendant may, under certain circumstances, show prior uncommunicated threats of the deceased against the defendant, and from those cases they seek to establish at least some analogy to the case under consideration. The doctrine of self-defense rests upon principles established to govern cases of homicide where self-defense is alone relied upon, and we are aware of no principle upon which it can be held that because certain evidence is admissible in those cases the same evidence would be admissible in a case of this character. In a case where self-defense is relied upon, the conduct of the defendant in respect to whether he used more force than was actually necessary is always an important inquiry, and communicated threats are admissible on account of the effect they may have had on

the defendant's mind, leading him to guard against or repel a threatened attack; and uncommunicated threats may be proven, as held in *Campbell* v. *The People,* 16 Ill. 18, for the purpose of characterizing the conduct of the deceased in the assault in which the homicide was committed. It is thus apparent that the principle upon which threats are admissible in cases of self-defense can have no application to a case of this character, where it is attempted to show suicide by the threats of the deceased, when no act or attempt by the deceased is shown in connection with the threats.

It is also insisted that improper remarks were made by the State's attorney in his closing argument to the jury, and upon this ground the judgment should be reversed. The remarks made by the State's attorney to which objection has been made, were as follows: "You, gentlemen, as citizens of the county, frequently hear this said,—probably said it yourselves, as citizens of this country and county,—that crime does go unpunished in this country." We perceive no objection to this language. The State's attorney had the undoubted right to call upon the jury to sustain the laws, and if it was a matter of notoriety in the community that crime went unpunished, we see no reason why that fact might not be spoken of in the argument.

The State's attorney also referred to the fact that two poisoning cases occurred in the city of Aurora within the last five years, and said: "Those two cases occurred right in the vicinity, or one of them, where this woman lived. These people, I say, thought they could repeat that operation. They thought they could remove Kelchner by arsenic, just as these other people had done in Aurora, and they never be convicted of it. They thought you can not convict in arsenical poisoning cases. They thought, in the first place, they would get him buried before anybody discovered what was the matter. They thought they could give him this arsenic and that he would die soon,—that he could be buried and they get him

under the sod before it would be suspected.   No doubt many cases have there been of that kind where deadly poisons have taken off the husband or wife.   Secret murders of that kind have never come to light,—murders of that kind where the doctors did not diagnose the case right; and, gentlemen, in this case it came very near being that way," etc.

As a general rule the argument should be confined to the evidence, but by way of illustration known facts may be referred to in argument; and we perceive no reason why the State's attorney might not insist, in argument, that the defendants thought they could remove the deceased by the use of arsenic, and cover up their crime and escape punishment, as others had done.   Perhaps it may be true that some unguarded remark fell from the lips of the State's attorney that was improper and should not have been made; but if that is the case, the judgment can not be reversed on that account.   It is impossible to lay down any general rule in regard to what shall or shall not be said in an argument to the jury, but unless it is apparent that defendants have been injured by improper remarks, the judgment should not be reversed on that ground, alone.

It is next claimed that the court erred in the instructions to the jury.   The first instruction complained of is No. 3, given for the People, and the objection made to the instruction is, that it singles out a particular portion of the evidence and directs the attention of the jury to it.   Upon an examination of the instruction we do not think that the objection urged against it is tenable.   It is clear, from the evidence, that the two defendants had for several years before the alleged crime been guilty of adultery, and it was proper that the jury should be instructed that the evidence of adultery was admissible, not for the mere purpose of establishing the fact Siebert had been guilty of adultery with the wife of the deceased, but the proof of adultery was admissible on the question of motive.   Thus far the court, in the instruction, called the attention of the

jury to a particular portion of the evidence, which it was proper for the court to do.

The fourth instruction states the law to the jury upon the question of principal and accessory. As an abstract proposition of law no fault is found with the instruction, but it is said there was no evidence upon which the instruction could be predicated, and upon this ground it is erroneous. We are not able to concur in this view. There was evidence introduced on the trial that might properly lead the jury to believe that one of the defendants administered the poison while the other stood by aiding and encouraging the act. The evidence tended to prove a desire on behalf of the defendants to get the deceased out of their way. As their declarations showed, to use the language of one of the defendants, they "wished he would get up and get out." While the evidence was not direct and positive, yet there was evidence, and, as we think, enough to predicate the instruction upon.

Objection is also made to the sixth and seventh instructions. The two are quite similar. The sixth, in substance, directed the jury that it was not necessary to prove each link in the chain of circumstances relied upon, beyond a reasonable doubt, it being sufficient, taking the testimony altogether, that the jury be satisfied, beyond a reasonable doubt, that defendants are guilty. The seventh, in substance, declared that it was not necessary to prove every fact beyond a reasonable doubt, if the jury, from all the evidence, believe, beyond a reasonable doubt, that the defendants are guilty. It will not be necessary to enter upon any extended discussion of the instructions, as the rule declared by them has been approved in *Weaver* v. *The People*, 132 Ill. 536.

Objection is made to the eighth instruction, which was as follows:

"The court instructs the jury that the defendants, William B. Siebert and Catharine Kelchner, having become witnesses in their own behalf, at once became the same as any other wit-

nesses, and their credibility is to be tested by and subjected to the same tests as are legally applied to any other witnesses; and in determining the degree of credibility that should be accorded to their testimony, the jury have the right to take into consideration the fact that they are interested in the result of the prosecution, as well as their demeanor and conduct upon the witness stand; and the jury are to take into consideration the fact, if such is the fact, that they have been contradicted by other witnesses. And the court further instructs the jury, that if, after considering all the evidence in the case, they find that the accused have willfully and corruptly testified falsely to any fact material to the issue in this cause, they have the right to entirely disregard their testimony, excepting in so far as their testimony is corroborated by other credible evidence or facts and circumstances proven in evidence in the case."

This instruction is fully sustained by *Hirschman* v. *The People,* 101 Ill. 568, and *Rider* v. *The People,* 110 id. 11, and we shall content ourselves by referring to these cases to sustain the action of the court in giving the instruction.

It is, however, said, that the instruction is condemned by *Purdy* v. *The People,* 140 Ill. 46. There is a misapprehension of the doctrine announced in that case. In the discussion of the *Purdy case* it was not intended to overrule the cases cited, nor to change the rule of law declared in those cases, nor do we think a close examination will disclose any conflict between the decision in the *Purdy case* and the other two cases.

It is also claimed that the court erred in refusing defendants' sixth and ninth instructions. They, in substance, directed the jury not to consider the contents of a certain box and vial which had been offered in evidence. The vial contained the arsenic which Prof. Haines testified he had taken from the contents of the stomach of the deceased, and the box contained the "Rough on Mice" which Siebert purchased, and which was found in his Geneva saloon. The position of counsel is, that the offer was not broad enough. It is conceded that the vial

38—143 ILL.

and the box were offered in evidence, but it is said the contents were not formally offered in evidence, and hence could not be considered. The testimony fully explained to the jury what the box and vial contained, and the only object of offering in evidence the box and vial was to get the contents before the jury. Under all the facts, we think when the vial and box were admitted in evidence the contents also went in evidence.

It is next claimed that the verdict is against the weight of evidence. We shall not enter upon a critical analysis of the evidence, but content ourselves with a reference to a few of the leading facts.

It appears that Edwin H. Kelchner, the deceased, was a carpenter by trade, and for eight or nine years before his death worked for the Burlington Railroad Company at its shops in Aurora. It was his constant habit to leave his home at about half-past six in the morning, take his dinner pail, work until noon, eat his dinner at the shops, work until evening, and return home about half-past six. His family consisted of himself, his wife, a son, Odelleon, aged seventeen years, a daughter, Minnie, aged twelve years, and a son, Raelue, aged six years. In the fall of 1888 Mrs. Kelchner met the defendant Siebert at his saloon, and the two soon became infatuated with each other. He became a frequent visitor at her house in the absence of her husband, and she frequently visited him at his rooms which he occupied, over his saloon. Siebert owned a house on the west side of the river, and he proposed to the Kelchners to move into his house and he would give them the rent for his board. In August, 1889, they moved into his house. Mrs. Kelchner occupied a bed-room down stairs. Kelchner occupied a bed-room in the back part of the house, up stairs, and Siebert occupied two front rooms up stairs, and boarded in the family. The affection between Siebert and the wife of the deceased seemed to grow from time to time. They were seen to kiss each other, and she was also seen sitting in Siebert's lap. There were various other manifestations of

their affection which it is not necessary to enumerate. At the same time the deceased seemed, from the evidence, to be an encumbrance which Siebert and Mrs. Kelchner desired to get out of their way. One witness testified she heard Siebert say he would give the deceased "$1000 for his woman if he would pack up and clear out." The same witness testified she heard Mrs. Kelchner say, "I wish the old fool was dead." She kept her door locked, as the witness testified, and did not allow her husband to go into her room. At one time, she testified, "I heard him go down and knock at her door, and she told him to go along and mind his business." She threatened to get a divorce from her husband. Siebert said, "If he don't like the style why don't he get up and get out?" Mrs. Kelchner said, "I would think as much." She also said, "Siebert was going to fix up the house in great style, but as long as Kelchner staid he never would do it." It was also proven that Siebert said, "He thought Mrs. Kelchner was a real nice woman. He was stuck on her, and expected she would be his wife in a year or two."

The death of the deceased occurred on Thursday evening, October 9, 1890. On Monday night of October 6, the deceased, his wife and three children, and Siebert, were the only persons who remained in the house occupied by the deceased, during the night. On Tuesday morning the deceased arose at the usual hour, prepared breakfast, and he and his son Dell ate alone. The deceased then put his dinner in the same dinner pail he always used. Dell put his dinner in the basket he usually carried, and the son left the house with his basket about half-past six o'clock. The deceased soon after left the house, with his dinner pail, for the shops, and commenced work at the usual hour. The men in the shops testify that he worked as usual until noon. At twelve o'clock he got his dinner pail, warmed his coffee, sat down with other men in the shop and ate his dinner. After dinner, as usual, he stepped out to get a drink of water. Within thirty minutes after eat-

ing he was taken very sick with extreme pain in the stomach and severe vomiting. The vomiting continued, and the suffer- ing was so great that the men in the shop sent for his son, who procured a carriage and took him home. A doctor was summoned, who prepared a prescription, which was filled at the drug store. Mrs. Kelchner had gone to Naperville at one o'clock. A telegram was sent to her, and she returned at six o'clock. From that time until his death the deceased was in charge of his wife, Siebert, and the children, who gave him medicine. On Wednesday morning the deceased felt some better and got up, stepped out of the house for a moment, but soon came in and drank some coffee, and feeling worse went to his bed. From that time on he grew worse until he died.

Dr. Murphy and a consulting physician called on Thursday afternoon, suspected poisoning, and so notified Mrs. Kelchner. After the death the coroner was notified, and a *post mortem* was had on Friday morning. The stomach, the liver and con- tents of the stomach were delivered to Prof. Walter S. Haines, who found in the contents of the stomach something over five grains of undissolved arsenic, which was detected with the naked eye. It was proven by Prof. Haines, who for nineteen years has made the subject of poisons a special study, and by Prof. John H. Long, professor of chemistry in the Chicago Medical College, and by Dr. H. N. Moyer, professor of medi- cine at Rush Medical College, that, vomiting as the deceased did during his last sickness, the undissolved arsenic found in the stomach was administered to him within from two to four hours of his death. During this time, and, indeed, during the entire day of his death, the defendants gave the deceased his drinks and medicines. It was also shown that during Thurs- day the deceased was unable to procure or take anything except as it was furnished and given by the parties in charge. It seems, therefore, apparent, from the evidence, that the arsenic found in the stomach at the time of Kelchner's death was given him by the defendants. It is also plain, from the

evidence, that the first attack which the deceased had on Tuesday was produced by arsenic placed in his pail or dinner by some one. It is true that no witness saw the defendants place poison in the pail of the deceased, but that fact might be proven by circumstantial evidence. It was shown by the evidence that the dinner pail used by the deceased is what was known by shop-men as a "two-story" dinner pail. It is so arranged that coffee is placed in the lower half and food in the upper half. The defendants occupied the house with the deceased on Monday night. No other persons were in the house but his children. Two grains of arsenic, as shown by the evidence, is a sufficient dose to produce death. That quantity of poison, or even more, could have been placed in the pail during the night or the next morning, by any occupant of the house, without being detected by the deceased at the time he placed his coffee in the pail.

But whether this is the correct theory or not is immaterial. If the entire evidence introduced before the jury, when considered as a whole, was sufficient to fairly establish the fact, beyond a reasonable doubt, that the deceased came to his death from poison administered by the defendants, when or in what particular manner the poison was administered to him can make no difference. Moreover, the guilt of the defendants was a question of fact for the jury to determine from all the facts and circumstances in evidence in the case, and after a careful consideration of all the evidence we are not prepared to say the verdict of the jury was not authorized by the evidence. Indeed, after a careful consideration of the entire record we find no substantial error, and the judgment will have to be affirmed.

*Judgment affirmed.*

BAILEY, C. J., and BAKER, J., dissenting.