Jacobs v. The People.

---

### J. J. Jacobs v. The People of the State of Illinois.

#### Gen. No. 11,597.

1. LOTTERY—*evidence held to establish.* The evidence in this case held to establish the setting up and maintenance of a lottery under the guise of an investment enterprise.

2. DOCUMENTS—*effect of illegally obtaining, upon competency of.*

Papers, if unlawfully obtained, may be used in evidence if competent and pertinent to the case.

3. PROPOSITIONS OF LAW—*when statute providing for submission of, does not apply*. The section of the Practice Act providing for the submission of propositions of law to be held or refused by the court where trial is had without a jury, has no application to criminal cases.

Criminal prosecution for setting up a lottery, etc. Error to the Criminal Court of Cook County; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the October term, 1903. Affirmed. Opinion filed November 28, 1904.

**Statement by the Court.** The indictment against the plaintiff in error contains eight counts. A *nol. pros.* was entered as to the seventh count. The other counts charge as follows:

First count alleges, after the formal parts, that J. J. Jacobs on April 20, 1903, in Cook county, " did unlawfully set up a lottery, then and there called the Montana Mining, Loan and Investment Company, for money, the amount of which is to said jurors unknown, with intent to then and there make the disposal of the said money then and there dependent upon a chance by numbers, whereby the said chance was then and there made an additional inducement to the disposal of the said money contrary to the statute," etc.

Second count alleges that J. J. Jacobs, in said Cook county, in the State of Illinois aforesaid, " unlawfully did sell a ticket in a certain lottery then and there called the Montana Mining, Loan and Investment Company, then and there set up to dispose of money (a more particular description of said money is to the said jurors unknown), then and there the money of the said the Montana Mining, Loan and Investment Company as aforesaid, with intent to then and there make the disposal of said money dependent on a chance by numbers, whereby the said chance was then and there made an additional inducement to the disposal of said money, contrary to the statute," etc.

The third count is exactly the same as the second count, except that after the words " unlawfully did sell " are the words " to a person to said jurors unknown."

The fourth count charges that Jacobs, in said county of Cook, in the State of Illinois, " did unlawfully set up and promote a certain lottery, then and there called the Montana Mining, Loan and Investment Company, contrary to the statute," etc.

Fifth count charges that Jacobs, in said county of Cook, in the State of Illinois, "did unlawfully have in his possession, with intent to then and there sell the same, a certain ticket in a certain lottery then and there called the Montana Mining, Loan and Investment Company, then and there set up to dispose of certain money, a more particular description of which said money is to said jurors unknown, the money of said the Montana Mining, Loan and Investment Company, with intent to make the disposal of said money then and there dependent on a chance by numbers, whereby said chance was then and there made an additional inducement to the disposal of said money, contrary to the statute," etc.

The sixth count is exactly the same as the fifth, except that the word " negotiate " is substituted for the word " sell " where it is used in the fifth count.

Eighth count charges that Jacobs, in said county of Cook, in the State of Illinois, " unlawfully did sell a certain ticket in a certain lottery, which said lottery was then and there set up for the purpose of then and there disposing of money, with intent to then and there make the disposal of said money in said lottery then and there dependent on a chance by numbers, whereby said chance was then and there made an additional inducement to the disposal of said money, contrary to the statute," etc.

A jury was waived and the cause was submitted to the court for trial. The court found the defendant guilty. Motions for a new trial and in arrest of judgment were made and overruled, and judgment was rendered on the finding. The judgment, omitting the formal part thereof, is in these words: " Therefore it is considered, ordered and adjudged, that the said defendant, J. J. Jacobs, is guilty of the crime of unlawfully setting up and promoting a lottery,

for money, upon the indictment in this cause, on the said finding of guilty, and that he is hereby sentenced to pay a fine of fourteen hundred and seventy-five dollars, and pay all the costs of these proceedings, and that execution issue therefor. It is further ordered that the said defendant, J. J. Jacobs, stand committed until said fine and costs are fully paid." The bill of exceptions shows exceptions to the overruling of the motions for a new trial, and in arrest of judgment, and to the entering of judgment; but shows no exception to the finding.

EDWARD H. MORRIS, for plaintiff in error; B. S. THRESHER, of counsel.

CHARLES S. DENEEN, State's Attorney, and ALBERT C. BARNES, Assistant State's Attorney, for defendant in error.

MR. JUSTICE ADAMS delivered the opinion of the court.

Plaintiff in error will be referred to as defendant in the following opinion. Counsel for defendant contends, in his argument, that the finding of the trial court is contrary to the evidence; that certain evidence offered by The People was improperly admitted, and that the court erred in refusing to consider certain propositions tendered on behalf of the defendant to be held as law in the case. Counsel contends that the evidence fails to show that the " Montana Mining, Loan and Investment Conpany is or was a lottery." The company thus named claims to have been chartered by the State of Montana in 1892, with headquarters at Butte, Montana. There is no evidence, however, that it is a corporation, except its name, and the fact that it has a president, is such evidence. The defendant, J. J. Jacobs, was, as he testified, the general agent of the Montana Mining, Loan and Investment Company. His office was at room 222, 225 Dearborn street, in the city of Chicago, Illinois. He was also one of the firm of Jacobs Brothers, at 76 Sherman street, in said city, where the certificates or tickets hereinafter mentioned were printed.

About April, 1903, C. R. Woolridge, a police officer, of

the city of Chicago, in company with other police officers, went to the office of the defendant, room 222 in the building numbered 225 Dearborn street, with a search warrant, to search the office for gambling material. The sign on the door of the office was "The Montana Mining, Loan and Investment Company." The officers found there a lot of printed matter, some in defendant's desk and some in a vault in the office. Some of the matter so found was put in evidence by the prosecution, and indicates the character of the company's and defendant's business. Among the documents so found and put in evidence are the following : A printed sheet headed, "The New Idea. Friday, Dec. 20, 1901," under which heading' are the words, "Monthly Statement of the Montana Mining, Loan and Investment Company. Capital Stock, Full Paid, $12,000,000. Butte, State of Montana. Chartered until 1912." Then follow these words: "Loan Series '118 L' made at Butte, Montana, Dec. 20, 1901." Next followed these words: " The management of this Company have recommended that loans be made for a period of ten years and two months to subscribers of stock in this Company, in amounts ranging from $2.00 to $15,000, as shown by the following statement: All loans to be made only to subscribers of stock, who hold certificates numbered as below set forth, and each certificate holder to receive such amount as is indicated in the following statement next opposite the number of his certificate. One hundred thousand certificates or receipts, for partial payments on shares of stock, are offered for sale each month. All persons holding certificates numbered as below are requested to present their credentials to the Company, or its agents, within ninety days from the date of this statement, and get their money." Underneath the foregoing statement are nine columns of figures about thirteen and one-half inches in length. In each column there are two rows of figures. The first row is headed "Certificate" and the figures under that word are the certificate numbers, opposite which, in the column and under the word "Loan," are

figures representing the loans offered. The specified loans run all the way from $8 to $2,000.

In the statement the following, which is printed in four languages, appears:

### "READ!

The Montana Mining, Loan and Investment Company, of Butte City, Montana, was chartered by the State of Montana in January, 1892, for a period of 20 years. The capital stock of the Company is $12,000,000. The Company was organized for the purpose of prospecting, locating and acquiring mining properties and making other investments and FOR THE LOANING OF MONEY.

The proposition of the Company is a new idea, and there is no other company like it in the world. It is the only Company that gives its patrons an interest in its profits or earnings, in addition to the Loans distributed each month. The Montana is the only Company that a person does not lose his or her money in if they do not get a loan.

Any person can invest in this Company in sums from 25 cents up. Certificates or receipts can be had from agents, or by sending by express to Henry L. Haupt, President, Butte City, Montana, or to his office, 225 Dearborn St., Chicago. NOTICE THIS: Never send less than two dollars for certificates, for if you do, you will not get anything for it, as it will not pay the Company to send out less than two dollars' worth of certificates. Should you not wish to invest as much as two dollars a month, then buy from an agent or send two dollars for certificates and sell some of them to your friends. AGENTS WANTED EVERYWHERE. Price of certificates, 25 cents, 50 cents and $1. $60 worth of certificates for $50.

The Company makes Loans on the 20th of each month, except when the 20th is Sunday, then the Loans are made on the 21st. There are 5,404 Loans, amounting to $55,000, made each month, ranging from $2 to $15,000. Remember, that every certificate bought of this Company gives the buyer an interest in the Company, and that every certificate is worth its face value in a full-paid and non-assessable share of stock—par value, $120—in this Company in 1912.

REMEMBER: This is the only company of this kind that has its Main Office in the United States and that this is the only Company deserving of your patronage. The people who make their money in the United States should see that

they do not send their earnings to Honduras, to Mexico, to Santo Domingo, or any other South American country. Invest your money where it will do you and your fellow citizens the most good. Insist upon having the Montana.

The Company will pay all Express charges on sums of $2 or over, but all charges must be prepaid on any amount less than $2."

On the back of the sheet there is printed an extract purporting to be from a newspaper, to the effect that a Mr. William Lawson, November 20. received on his share $15,000. At the bottom of the sheet is this notice: "Agents generally will advance loans to applicants, or any bank or express company in the world will transmit money loaned by this Company to its customers." Signed, "Henry L. Haupt, President, Butte City, Montana."

This document shows that a so-called loan of $15,000 will be made to the lucky holder of the certificate corresponding with that amount, the certificate costing only one dollar. Also, that whether the certificate is good for only an $8 loan or a $15,000 loan, depends solely on chance. No security is required by the matter under the heading, "Read!" above quoted, and the fact is that none is required or given, and that no stock in the concern was issued to purchasers of certificates, and no money returned by any certificate holder who received a so-called loan.

William J. Grosklaus, who was in defendant's employ for four years, testified that he never knew of a loan being paid off by one who got the money, nor of any security having been given by any one to whom a loan was made, nor of any certificate of stock having been issued.

Another printed document of date March 20, 1903, similar to that above mentioned, was put in evidence, on the back of which is printed what purports to be an extract from the Fall River Evening News, of Massachusetts, of date January 12, 1903, to the effect that one C. S. Martin had bought stock in the Montana Mining, Loan and Investment Company, and had just received a loan of $15,000, in pursuance of an application which he had made, and which was granted by the company December 20, 1902.

Blank certificates of the kind issued by the company were put in evidence. They certify as follows:

"This certifies that ............... of ............ State of ............, has paid to the above named Company the sum of one dollar, in part payment for one share of the capital stock of said company, of the par value of one hundred and twenty dollars, the balance payable in consecutive monthly installments of one dollar each, and hereby makes application to the trustees of said company for a loan, as authorized by the provision of the by-laws of said company. Applications for loans must be made by subscribers not later than the fifteenth of the month in which this certificate is issued. Loans applied for and approved must be called for within ninety days from the date hereof.

HENRY L. HAUPT, President.

Dated Monday, April 20, 1903."

Other similar certificates, acknowledging payment of fifty cents, were in evidence.

We think it an insult to common sense to claim that any sane man needing a loan of money, and desiring to procure it, would adopt the method indicated by the documents referred to. Such an one would know just the amount he wished to borrow, and would not rely on chance, nor apply where the amount, if anything, which he would obtain might be a mere bagatelle. It may also be said that no one engaged in the legitimate business of lending money would lend it in the manner the Montana Company claims it lends money.

The evidence also shows that a book of cyphers was issued by the Montana Company, entitled "Instructions How to Collect a Large Loan." Why this precaution, if the Montana Company was engaged, as is absurdly claimed, in a legitimate business? That the company was not averse to having it known that some of its patrons were lucky, is sufficiently evidenced by its advertising the good fortune of Lawson and Martin. No one who paid money for one of the company's so-called certificates was in the least deceived by the transparently flimsy devices to which it resorted to evade the law. Every one so investing his money knew he was investing in a lottery. The two state-

ments headed "New Idea," etc., above referred to, are, of themselves, sufficient evidence that the Montana Company was running a lottery. The number of the so-called certificates in each of the statements is very large, and opposite every certificate number is a sum representing the amount proposed to be loaned to the purchaser of the certificate. The aggregate of the proposed loans thus indicated is very large. The presumption is that the company is not operating its scheme for amusement, but for gain. But, on the hypothesis that all the certificates numbered in the statements were the only ones issued and sold for the months indicated in the statements, and that the proposed loans were made to the purchasers of the certificates, without security, and that none of them returned any of the money received by him, which was the company's experience, it is obvious that there would be, each month, a serious loss to the company. There could only be a gain or profit by the issuance and sale of a large number of certificates in respect to which no loan was to be made, and the defendant's counsel, in his argument, naively tells us, and the evidence shows, "there are 100,000 certificates or receipts for partial payments, on shares of stock, whose numbers run from 1 to 100,000, consecutively, that is, 1, 2, 3, 4 and so on, until the last certificate, or receipt, is numbered, which, of course, is 100,000."

The statements referred to, being intended for the public eye, contain only the numbers of certificates in respect to which it is proposed to make loans, as is usual in lottery statements, and 100,000 is greatly in excess of the numbered certificates in either statement. It is noticeable that neither Grosklaus, defendant's employee, nor defendant, himself, could, while testifying, exclude from his mind the fact that the so-called certificates were lottery tickets. Grosklaus : "The small envelopes were used to put the tickets in, and to send to agents." "The number of the ticket I hold is 34,962." "If Jacobs paid the money on the tickets, he sent them to Butte." Jacobs : "I could not mail a letter to the president of the company, or any of

the tickets or certificates; for that reason I expressed them." " The unsold tickets are returned to me, with the name cut off. The agents send to me the tickets that are entitled to a loan." " When the ticket which is entitled to a loan is sent to me, I send it to Butte, Montana, the home office." " I don't know the name of a person that purchases a ticket until the tickets are sent to me after the monthly statement," etc.

Other evidence might be referred to, but it is sufficient to say that the evidence is conclusive that the Montana Company had established and was maintaining a lottery.

Defendant's counsel interprets the indictment as averring " the setting up of a lottery " in Cook county, Illinois, and contends that this averment is necessary to be proved, and says that the evidence does not support .the averment. Assuming, merely for argument's sake, that the indictment so avers, and that proof of the averment is necessary, we cannot concur in counsel's assertion that the evidence does not show that the lottery was set up in Cook county. The evidence shows that the sign on defendant's office door, room 222, number 225 Dearborn street, Chicago, Illinois, was " The Montana Mining, Loan and Investment Company." The documents found in defendant's office had that name on them, and manifestly pertained to the company's business. The notice in the statement of the company, printed in four languages, and above quoted, contains the following : " Certificates or receipts can be had from agents, or by sending by express to Henry L. Haupt, President, Butte City, Montana, *or to his office*, 225 Dearborn street, Chicago." In " State's Exhibit 6," in evidence, which purports to be instructions to agents, the following appears :

"IMPORTANT NOTICE.

All Certificates on hand on the 19th of each month must be cancelled by cutting name of the President off (but the certificate must not be cut in two) and returned together with amount due for Certificates sold, less discount allowed. All such returns must be made to

MR. J. J. JACOBS,
Room 222, 225 Dearborn st., Chicago, Ill.

Do not make returns to Butte, for the reason that we are so far away it requires too much time to reach us and supply you with stock for the following month. By the time your returns reach our Chicago office, Monthly Statements and Certificates for next month will be ready to ship to you, so as little time as possible will be consumed in making exchanges.

With best wishes for success and pleasant business relations, I remain,

Respectfully yours,

HENRY L. HAUPT, President."

Jacobs, the defendant, testified that he was the general agent of the company; that he received in Chicago applications for loans; that he had the so-called certificates printed in Chicago; that sub-agents appointed by him would sometimes advance the money to a certificate holder entitled to a loan, and he, in turn, would repay the amount so advanced by the sub-agent, and settle with the company. In short, it appears that the company had an office in Chicago and transacted its business in Chicago by defendant Jacobs. The Montana Mining, Loan and Investment Company claims to be a Montana corporation, and it is certainly a new and untenable theory that a foreign corporation, having an office in Cook county, Illinois, and carrying on its business at such office, is not setting up its business in that county. If the Montana Company is not a corporation, the result is the same. Its business is the maintaining a lottery, and its having an office in Cook county for the transaction of that business, and the transacting of its business at said office, by an agent, is the setting up of its lottery in Cook county. Such being our conclusion, we do not deem it necessary to pass on the legal question whether it is necessary to prove, in order to sustain the conviction, that the company's lottery was set up in Cook county.

Defendant's counsel, in an additional argument, objects to the admission in evidence of the papers taken from defendant's possession, on the ground that they were unlawfully taken. Counsel does not argue the question. He does not point out wherein the seizure was unlawful, or cite

any authorities on the point. The issuance of warrants "to search' for and seize lottery tickets, or materials for a lottery, unlawfully made, provided or procured, for the purpose of drawing a lottery," is authorized by statute. Hurd's Rev. Stat. 1903, p. 680, parag. 373.

Papers, even though unlawfully obtained, may be used as evidence, if competent and pertinent to the case. Gindrat v. The People, 138 Ill. 103, 110; Siebert v. The People, 143 Ill. 571, 583; Trask v. The People, 151 Ill. 523, 529. The competency and pertinency to the issues of the evidence are not questioned.

The exceptions of the defendant to the refusal of the court to consider certain propositions presented to the court by his counsel, cannot be sustained. Counsel for defendant bases the right to present to the court, and have such propositions passed on, and held or refused, on section 41 of the Practice Act. Hurd's Rev. Stat. 1903, p. 1405. The section is as follows: "In all cases, in any court of record of this state, if both parties shall agree, both matters of law and fact may be tried by the court; and upon such trial either party may, within such time as the court may require, submit to the court written propositions to be held as law in the decision of the case, upon which the court shall write 'refused' or 'held,' as he shall be of opinion is the law, or modify the same, to which either party may except as to other opinions of the court."

Counsel argue that the indictment being for a misdemeanor, and a jury trial having been waived, the statute applies. The language of the statute is, "In all cases, in any court of record of this state,-if the parties shall both agree, both law and fact may be tried by the court," etc. This language, if applied to criminal cases, includes felonies equally with misdemeanors, and it is not the law that trials for felonies may, by agreement, be tried by the court without a jury. If it had been intended that section 41 should apply to a criminal case involving a misdemeanor only, it would have been easy to express such intention, as, for instance, in section 52 of the Practice Act it is pro-

vided: "Hereafter, no judge shall instruct the petit jury in any case, civil or criminal, unless such instructions are reduced to writing." The legislature, in enacting section 41, must be presumed to have known that, in trials for felony, the presence of a jury is, under the constitution, jurisdictional, and cannot be waived, (Harris v. The People, 128 Ill. 585,) and therefore the legislature, in using the language, "In all cases," etc., could not have intended criminal cases, but merely all civil common-law cases.

In Railway Conductors' Benefit Association v. Robinson, 147 Ill. 138, 150, the court say: "It must be admitted what is usually known as the Practice Act has no reference to modes of proceeding in chancery cases, except as the language, either expressly, or by clear implication, refers to such procedure."

It is not contended by counsel that, if the Montana Company was operating a lottery, and set it up in Cook county, the defendant was not guilty; nor can it reasonably be so contended, in view of the evidence. The evidence shows that the defendant sold the company's tickets in Cook county.

The judgment will be affirmed.

*Affirmed.*