# THE STATE v. KENNEDY.

1. **Criminal Law**: CHANGE OF VENUE: DISCRETION OF COURT. After a jury had found defendant guilty of murder in the first degree, the verdict was set-aside on the ground that one of the jurors was an alien. Defendant then moved for a change of venue because of the alleged prejudice of the people of the county. The motion was supported by the affidavits of defendant and seven others, none of whom were shown to be disinterested, and by thirty-three extracts from newspapers published in the county, but such of these as were calculated to excite prejudice against defendant were published prior to the first trial. The allegation of prejudice was controverted by forty-four counter-affidavits on the part of the state. *Held* that the court did not abuse its discretion by overruling the motion. (See Code, sec. 4374, and *State v. Perigo*, 70 Iowa, 660.)

The State v. Kennedy.

2. ——— : ——— : ORAL EXAMINATION OF AFFIANTS. Where defendant had moved for a change of venue, and the state had filed counter-affidavits, a motion by defendant to have the affiants on the part of the state brought into court and orally examined, on the alleged grounds that such persons had made up their minds, and expressed their opinion that defendant was guilty, and that their affidavits were false, and that they would so appear upon such oral examination, was properly overruled, where there was nothing in the record, aside from the statements made as the ground of the motion, to indicate that the counter-affidavits were not made in good faith.

3. ——— SELECTION OF JURORS : OBJECTION : APPEAL. Defendant in this court claims that the trial court erred in refusing him a new trial on the ground that the names of jurors summoned by special *venires* were not written on separate ballots and mixed and drawn from a box, as required by law, but were read from the lists in the hands of the sheriff. The truth of this claim is not shown by the record, and there is nothing to support it except the affidavit of defendant's attorney attached to the motion for a new trial. *Held* not sufficient to overcome the presumption that the jurors were drawn in the manner required by law.

4. ——— : NEW TRIAL : INTOXICATION OF JUROR. A person accused of crime is not required to abide the decision of a drunken juror, but the mere drinking of intoxicating liquors by a juror during an adjournment of court will not authorize the setting aside of a verdict of guilty. (See *State v. Livingston*, 64 Iowa, 560 : *State v. Bruce*, 48 Iowa, 536.) The evidence as to the alleged drunkenness of a juror in this case (see opinion) is so unsatisfactory that it cannot be said that the court erred in refusing a new trial on that ground.

5. ——— : MURDER : CIRCUMSTANTIAL EVIDENCE. Defendant was convicted of the murder of his wife. The evidence (see opinion) was wholly circumstantial, but plainly showed that the crime had been committed, and tended to show that defendant was the perpetrator of it. *Held* that the verdict of the jury, rendered under proper instructions, finding the defendant guilty, could not be interfered with by this court on the ground that it was not supported by sufficient evidence.

*Appeal from Dubuque District Court.*—HON. JOHN J. NEY, Judge.

FILED, FEBRUARY 12, 1889.

The defendant was indicted and tried for the crime of murder in the first degree. The jury found him

guilty as charged, and determined that he should be punished with death. He was sentenced to be hanged on the first day of March, 1889, and appeals.

*McNulty & Barnes,* for appellant.

*Alphons Mathews* and *John Y. Stone,* Attorney General, for the State.

ROBINSON, J.—On the twenty-sixth day of April, 1887, the dead body of Mary Kennedy, the wife of defendant, was found in a meadow about half a mile from his home, in Dubuque county. Eleven wounds were found upon her face and scalp, and there were bruises on her arms, left hand and scalp and face. The most severe injury was a wound which commenced in front of the right ear, and extended thence under the skin to a point about the middle of the right eyebrow. From a point between the extremities of that wound, near the eye, another wound extended under the skin and under the eye to the nose, where it came out. This double wound appeared to have been made by a chisel, or some similar instrument, which seems to have been partially withdrawn after the first wound was made and again pressed forward and inward, making the second wound. This was of uniform width. The external wound near the ear, and also the one near the nose, were about one and one-half inches in width. Of the other wounds several were severe and incised. One appeared as though it might have been made by a boot-heel. The temporal and other arteries were severed, and death resulted from hemorrhage and the shock caused by the injuries. No fracture of the skull or extremities was found. There were indications of a severe struggle near where the body was found. Portions of the body were exposed, and the clothing was disarranged, as though rape had been attempted, but there were no indications that it had been accomplished. The defendant was arrested, and indicted for the murder of his wife. He was tried for the offense at the September term, 1887, of the

The State v. Kennedy.

Dubuque district court. The jury returned a verdict of guilty on the twenty-fourth day of September, 1887, and determined that he should be punished with death. That verdict was set aside, and a new trial was awarded to defendant on the ground, as stated by his counsel, that one of the jurors was an alien. On the thirty-first day of October, 1887, the defendant filed a motion for a change of the place of trial to Delaware county, on the grounds that he had been once tried in Dubuque county, and that the inhabitants of that county were so prejudiced against him that he could not obtain a fair trial therein. The motion was overruled, and the second trial was had at the January term, 1888, of the Dubuque district court, and resulted as already stated.

I. Counsel for appellant insist that the court erred in overruling the motion for a change of venue. The motion was supported by the affidavits of defendant and seven others, to the effect that a fair trial in Dubuque county could not be had by defendant by reason of excitement and prejudice against him. It was also supported by thirty-three extracts from newspapers published in Dubuque, and circulated in Dubuque county, and reference was made in it to the record of the case, showing the facts in regard to the summoning and empaneling of the first jury. The fact that the defendant had been once tried and convicted in Dubuque county was not, of itself, sufficient to justify a change of venue. None of the witnesses who verify the applications of defendant were shown to be disinterested. Of the newspaper extracts, seventeen were published within two weeks of the discovery of the murder. Among those are the only ones—five or six in number—which contain statements calculated to arouse excitement or prejudice against defendant. The others contain recitals of proceedings before the coroner's jury, before the justice on the preliminary hearing, and in court. As a rule, they are free from passion and from reflections on defendant. We must assume, in the absence of a showing to the contrary, that defendant was advised of the newspaper

1. CRIMINAL law : change of venue : discretion of court.

articles published in April and May, 1887, before his first trial was commenced, and that he did not then think that excitement or prejudice which would interfere with his having a fair and impartial trial existed. The newspaper articles which were subsequently published were not of a character to inflame the public. The forty-four counter-affidavits filed on behalf of the state tend to show that whatever excitement or prejudice there had been in regard to the murder existed soon after it was committed, and that it died out before the trial was commenced in September. The fact that a special *venire* had been issued, on the suggestion of the state, for one hundred persons qualified to act as jurors, did not show excitement or prejudice against the defendant, but rather a desire to secure a fair trial. Applications for changes of venue in criminal cases are to be decided by the trial court in the exercise of a sound discretion. Code, sec. 4374; *State v. Perigo*, 70 Iowa, 660. We discover nothing in the record which tends in any manner to show that there was an abuse of such discretion in this case.

II. After the state had filed its exceptions to the petition for a change of venue and its counter-affidavits, the defendant filed a motion asking that the persons who had executed the counter-affidavits be brought into court for oral examination, on the alleged grounds that such persons had made up their minds and expressed their judgment that defendant was guilty, and, in substance, that the counter-affidavits were false, and that an oral examination of the affiants would show that fact, and would sustain the petition for a change of venue. The motion was overruled, and, so far as we can discover, the ruling was correct. There is nothing in the record, aside from the statements made as the ground of the motion, to indicate that the counter-affidavits were not made in good faith, nor to show any intent to mislead or deceive the court.

2. —— : —— :
oral examination of affiants.

III. On the thirteenth day of January, 1888, a special *venire* for seventy-five persons qualified to act

The State v. Kennedy.

3. ——: selection of jurors: objection: appeal. as jurors was issued to the sheriff of Dubuque county, and on the seventeenth day of the same month a second special venire for twenty-five persons so qualified was issued. The defendant alleges as one ground of his motion for a new trial that the names of those persons who were required to appear by virtue of the special venires were not written on separate ballots, and mixed and drawn from a box, as required by law. This ground of the motion is supported by the affidavit of an attorney for the defendant, in which it is stated that the names of the extra jurors were not drawn from a box, but were read from the several lists in the hands of the sheriff. The transcript of the record shows that defendant objected to the filling of the panel from the men summoned by virtue of the special venires on the ground that such venires were improperly issued, but fails to show that the jurors were selected as claimed by defendant. The facts in regard to the empaneling of the jury should have been made a part of the record by a bill of exceptions. We are of the opinion that it is not competent to overcome the presumption which must be indulged in favor of the proceedings in the trial court, in regard to matters which occurred in the presence of the court, by means of an affidavit attached to the motion for a new trial. The rulings and other proceedings in the court below must be presumed to have been correct, until a competent showing to the contrary is made. We must therefore presume that the jury in this case was properly empaneled.

IV. Another ground of the motion for a new trial is alleged misconduct on the part of a juror named Freeman. One Lucas states under oath that a person he afterwards ascertained to be Freeman went into his saloon on Locust street, during the trial, and on the twenty-fourth day of January, 1888; that Freeman there stated that he was a juror in the Kennedy case; that the evidence was nearly all in, and clearly showed that defendant killed his wife; that a Dubuque jury ought to have nerve

4. ——: new trial: intoxication of juror.

The State v. Kennedy.

enough to hang Kennedy , and that the jury would be "damned cowards" if they didn't hang him.   Lucas further stated that Freeman remained in his saloon from twenty to thirty minutes; that he was not perceptibly drunk, but drank in his saloon.   An attorney for defendant states under oath that at two o'clock in the afternoon of January 24, 1888, Freeman came into the court-room "in a condition of beastly drunkenness;" and that in consequence of his condition the court was adjourned until the next morning.   The affidavit of Freeman was filed on behalf of the state, and he was examined orally on the application of defendant.   The state also filed the affidavit of nine of the remaining eleven jurors, and of the attorney for the state, and also a second affidavit of Lucas.   In that affidavit Lucas states, in substance, that he was not present during the trial, and did not know any of the jurors; that he does not know Freeman, and does not know that he ever saw him; that he does not know whether the man referred to in his first affidavit was a juror or not; that during the trial the case was talked about by men in his saloon, but he paid but little attention to the conversation; but, when an evening paper stated that one of the jurors was drunk his attention was called to what was said in the saloon in the forenoon, and that he knows nothing further about the man who was talking having been a juror.   A third affidavit of Lucas, was filed by defendant, in which he states that he did pay especial attention to what the man who claimed to be a juror said, and that he was called Freeman.   In view of the contradictions in the Lucas affidavits, and in view of the further fact that Freeman swears that he does not know where the saloon of Lucas is, but does know that he was not in any saloon on Locust street on the day in question, but little weight can be given to what Lucas says.   From the various affidavits and other matters of record we learn that the jury was empaneled on the seventeenth day of January, 1888; that the cause was being tried from that time until the next Saturday; that on that day court adjourned until the forenoon of the next

Monday; that the jury met at that time, but further proceedings were postponed, on account of the sickness of an attorney for defendant, until two o'clock in the afternoon of Tuesday the twenty-fourth day of January; that Freeman had been subject to attacks of a heart trouble for many years; that on the night of Monday, the twenty-third of January, he suffered an attack of the kind named, and was unable to sleep; that he was sick and unable to eat his breakfast, Tuesday morning; that between ten o'clock that morning and noon he drank "a big glass" of whiskey, and "two ponies" of whiskey,—a "pony" of whiskey being, as stated by counsel for defendant, a "half-price drink." Freeman remained somewhat under the influence of the liquors he had drunk until three o'clock of Tuesday afternoon. He drank no other liquor during the trial excepting a glass of beer during the first week. He and nine other members of the jury unite in stating that he was not intoxicated, nor under the influence of intoxicating liquor to any extent whatever, during any of the sessions of court while the trial was being had. It is urged by counsel for defendant that while Freeman may have been "physically sober" when the trial was resumed on Wednesday, yet his mind may have been, and probably was, still to some extent under the influence of the liquor he drank the day before. But, although the condition suggested by counsel was possible, there is nothing in the record which tends to show that it did in fact exist; while there is much which tends to show that it did not. In addition to the affidavits of jurors, we have the presumption which must necessarily be indulged in favor of the action of the court. The condition of the juror at two o'clock in the afternoon of Tuesday was specially called to the attention of the court, and steps were taken to prevent a repetition. It is fair to presume that the condition of the juror was noticed by the court when the trial was resumed on Wednesday, and that it was then satisfactory. It would indeed be an intolerable wrong to compel a person accused of crime to abide the decision of a drunken

juror, but it does not appear that defendant has suffered that wrong. The case is not different in principle from several in which this court has held that the drinking of intoxicating liquors by a juror during an adjournment of court would not authorize the setting aside of the verdict. *State v. Livingston*, 64 Iowa, 560; *State v. Bruce*, 48 Iowa, 536, and cases therein cited. We therefore conclude that the ground of the motion under consideration was not well taken.

V. There is no direct evidence of the guilt of the defendant of the crime of which he was convicted. The evidence relied upon by the state is circumstantial. It appears that the defendant and the murdered woman had been married twenty-two years at the time of her death. At that time they were living upon a farm a few miles northwest of Dubuque, which had been their home for nineteen years. They had five children, of whom John, aged sixteen years, was the eldest; Susie was thirteen years of age; James was ten; Charlie was seven; and Frank was five. They were engaged in supplying milk for the Dubuque market, and kept a number of cows, and much, if not most, of the work was done by Mrs. Kennedy. She owned the cows, while her husband owned the farm. For some time prior to the date of the murder, Kennedy and his wife led turbulent lives. Each was in the habit of drinking intoxicating liquors to excess, and both seem to have been quarrelsome when under the influence of liquor. On several occasions Kennedy struck or otherwise maltreated his wife. He frequently drove her from the house, and compelled her to remain out of doors among the neighboring hills all night. On one occasion he threw her down, dragged her by the hair, and placed his foot upon her neck. John was present, and tried to release his mother, but was unable to do so until he severed from her head the hair which was within his father's grasp. A few months before her death Mrs. Kennedy absented herself from home for several days. On the twenty-third day of April, 1887, she returned

*Note in margin:* 5. ——: murder: circumstantial evidence.

from Dubuque, where she had been with milk, and was met by her husband. He accused her of driving the horses too fast, and cursed her. She went into the house, and busied herself for a time with some sewing, while he unharnessed the horses, and then did the milking. While he was so engaged she left the house with a cream can, saying that she was going to Habbercorn's for sugar. Habbercorn kept a store and saloon about two miles from Kennedy's in a northwesterly direction. Mrs. Kennedy arrived there between seven and eight o'clock in the evening, purchased some sugar and whiskey, and had the latter put into the can. She drank some beer, and left between ten and eleven o'clock. From the fact that the sugar was afterwards found in an outbuilding near her home, and the can was found on the sill of a hay-barn, also near her home, and near a depression in the hay, it is surmised that Mrs. Kennedy returned to her home on Saturday night without entering it, and that she spent the night in the barn. She returned to Habbercorn's about nine o'clock Sunday morning, and procured beer and whiskey. She left there between twelve and one o'clock, saying that she must hurry home. She was last seen alive about one o'clock, walking or running on a road which led in a northeasterly direction along the Maquoketa river. This road left the direct road to Kennedy's, and continued in a southeasterly direction to a point a little more than half a mile northeast of Kennedy's, where it turned in a northeasterly direction. Other roads continued that east and northeast to the Peru road, which led to Dubuque. When Mrs. Kennedy was last seen, she was going in the direction of the point in the river road above mentioned, and was within less than a mile of it. Two days later her body was found a few hundred feet southwest of that point, and nearly on a line from it to her home. When Kennedy finished milking, Saturday night, he left home, saying he was going to Roab's and to Billmeyer's saloons to look for Mrs. Kennedy, and that if he found her he should kill her. Roab's was some two miles in a southeasterly direction, and

Billmeyer's was beyond Habbercorn's in an opposite direction. It is uncertain whether Kennedy knew, when he left home, where his wife had gone, and it is not probable that he saw her that night. The next morning he went to Dubuque, and on the way talked with one Burton in regard to his wife, and complained that she controlled the money. He returned home about two o'clock in the afternoon, under the influence of liquor, and cross. He left home about four o'clock in the afternoon, saying that he was going over to Scharf's, where John was at work, to collect his wages, and if he found his wife he should kill her. Scharf kept a saloon something over two miles east and half a mile south of. Kennedy's, on the Peru road. Kennedy arrived there after four o'clock, and remained until after six. While, there he drank whiskey several times. He left between six and seven o'clock, going northwest on the Peru road, and was seen to pass some houses a short distance from Scharf's. He was not seen between seven and nine o'clock, and was next seen at his home by his son James. It was about three miles by the roads, from the point on the Peru road where he was last seen, to the bend in the river road already mentioned, and about two miles across the fields. He claims to have left the Peru road soon after he was last seen in it, and to have returned through the fields to a railway crossing southeast of his home, from which he could see persons on both the railroad and wagon road from Dubuque; that he remained there for some time, watching for his wife; and that he went from there home. If this claim be true, it is not probable that Kennedy committed the murder; but the claim is not corroborated. On the contrary, some of the established facts tend to contradict it. At about nine o'clock Sunday evening Mary Lea heard a woman scream twice in the direction in which Mrs. Kennedy's body was afterwards found. She had known Mrs. Kennedy ever since she could remember; knew her voice; had heard her scream before, and recognized her voice in the screams. The first scream was loud; the second was as long as the first, but not so loud. The

place where the murder was committed was not quite half a mile from Kennedy's house. He reached home between nine and ten o'clock. When he entered the house James was sitting up, and saw blood on his father's face. Kennedy asked for a towel, but before James could get one he wiped his face and hands on a tick which hung over a pole in the kitchen. He and James went out to milk, and while there he asked James if he could get along without his mother, and then said he guessed they could. During the afternoon of Tuesday one Fallhopper found the body of Mrs. Kennedy. He did not recognize it, and did not know that she was missing. In notifying the people of that vicinity of what he had found, he informed Kennedy, but did not describe the body, nor the clothing. Kennedy made no answer to Fallhopper, and did not go to the body, but went three-fourths of a mile in the opposite direction, to a mine, where Burton was at work. He then told Burton and one Coffin that there was a body found up by the river, and from the description of the shawl he thought it was his wife. A day or two after the finding of the body, defendant was arrested, and his clothes worn the night of the murder were taken from him. Blood-stains were found on his stockings and the wristbands of his shirt, and what seemed to be similar stains were found on his pantaloons. The tick on which his son had seen him wipe his face was found to be stained with blood. At the time of the murder a carpenter named Fanning lived at Kennedy's, and kept in the pantry an unlocked box containing tools. On the Monday preceding the murder Fanning left tools at Kennedy's, and, among them, an inch chisel and another. At about four o'clock of the next Sunday, i. e., the day of the murder, he looked for the inch chisel, but did not find it. Some time during the next week he found the handle of the inch chisel, but did not find the blade. At that time he also missed another chisel-blade. Other facts, which are not of sufficient importance to enumerate, but which tend to sustain the theory of the state, were also proven. Counsel for defendant place

much stress upon the fact that the state failed to show where Mrs. Kennedy was from one o'clock to nine of Sunday afternoon, and that it has failed to show that defendant knew where she was during that time. But the time and place of the murder were shown, and it is also shown that Kennedy could have committed the crime. If the evidence for the state was reliable, there is room for little, if any, doubt as to the guilt of defendant. It was the province of the jury to determine the value and weight of the evidence. They have said by their verdict that it proves the guilt of defendant beyond a reasonable doubt, and we do not feel authorized to say that the verdict is so unsupported by the evidence as to justify us in setting it aside.

VI. The record discloses numerous objections made by defendant to the introduction of evidence, and numerous exceptions to rulings of the court, including the refusing to give certain instructions, and the giving of others. We have examined all rulings of which complaint is made with the care which the importance of this case demands. Very few of the rulings are discussed by counsel. It is sufficient for us to say that we discover no error of a nature to prejudice the defendant. He seems to have had a fair and impartial trial. The charge of the court to the jury was quite favorable to him, and fairly submitted the theory of the defense. We conclude that the judgment of the district court cannot be disturbed. It is therefore

AFFIRMED.