ARVESTA NORTHEY V. STATE OF NEBRASKA.

FILED APRIL 22, 1926.   No. 24813.

Homicide: INSUFFICIENT EVIDENCE. The substance of the evidence on which the state relies to support the verdict of murder returned by the jury is outlined in the opinion and is *held* insufficient to sustain the verdict.

ERROR to the district court for Custer county: BRUNO O. HOSTETLER, JUDGE. *Reversed.*

*A. P. Schnell* and *H. L. Wilson,* for plaintiff in error.

*O. S. Spillman, Attorney General, Lee Basye* and *William C. Schaper, contra.*

Heard before MORRISSEY, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

MORRISSEY, C. J.

On a trial in the district court for Custer county, defendant was convicted of murder in the first degree and sentenced to serve the term of her natural life in the penitentiary. As plaintiff in error, she has brought the record of her trial, conviction and sentence to this court for review.

The information, which follows, as closely as the facts will permit, the form outlined in *Nichols v. State,* 109 Neb. 335, charges that one Frank Bruner and this defendant, by the administration of poison, caused the death of Monna Bruner, wife of Frank Bruner, on November 24, 1924.

It is the theory of the state that Frank Bruner admin-

istered the poison which caused the death of Monna Bruner, but the information directly charges defendant Arvesta Northey with the administration thereof, as it is provided by chapter 89, Laws 1923, may be done.

The form of the information is challenged, but as it follows the statute and the form heretofore approved by this court, *Nichols v. State, supra,* this assignment may be disregarded.

There is one vital question presented, namely, the sufficiency of the evidence to sustain the verdict of the jury.

November 24, 1924, Monna Bruner died in the village of Sargent, Custer county, Nebraska, from mercury bichloride poisoning. Her husband was employed in the Chicago, Burlington & Quincy roundhouse at Sargent, and for a number of years he and this defendant, who had a husband, had maintained illicit relations. It is the theory of the state that Frank Bruner and this defendant, having become enamored of one another, desired the death of Frank Bruner's wife, and that, through some method which is not shown by this record, Bruner administered the fatal poison.

The state made proof of the long-continued misconduct of Bruner and defendant and, undertaking to show some causal relation between their improper relations and the death of Bruner's wife, offered in evidence statements made by defendant, after her arrest under the charge made against her in this case.

The sheriff, called as a witness for the state, testified that the county attorney, the deputy county attorney, and the sheriff interviewed defendant in the jail; that the county attorney told her, in substance, that if she had anything to say they were ready to listen; that defendant then said that she had already told everything she knew about the affair; that immediately after she had made that answer, he, the sheriff, was called to the telephone; that, on his return soon thereafter, the deputy county attorney, in the presence of the county attorney and defendant, said to the sheriff, "Mrs. Northey has said that she gave the tablets to Bruner and that she bought them at Gothenburg, Ne-

braska;" that the witness then said, "Now, Mrs. Northey, * * * did you really buy these tablets at Gothenburg and give them to Bruner?" and she said, "I have lied. I told them that, but I didn't have anything to do with it. I didn't buy the tablets there, and I didn't give them to Bruner, but Bruner wanted me to do that—Bruner wanted me to tell that." The state also offered in evidence an affidavit signed by Mrs. Northey, in which she admitted her criminal relations with Frank Bruner; that these relations had extended over a term of years, and that, in September preceding the death of Monna Bruner, defendant and Frank Bruner had made an extended trip in an automobile, giving the date on which the trip began and the names of a number of cities through which they passed. Among the cities mentioned is the city of Gothenburg, Nebraska.

The statement recites that she and Bruner had frequently talked about Bruner securing a divorce from his wife; that Bruner had told her his wife objected to his procuring a divorce, and that Bruner said that "he was going to get rid of his wife and I suspicioned that he might poison her;" that Bruner suggested to her that she get rid of her husband "by slipping a pill into his coffee;" and that Bruner visited at her house the day before the death of his wife.

Although Gothenburg is a comparatively small city, situated only a short distance from the county seat of Custer county, no witness was called from there to show that defendant procured any poison there. There is no evidence in this record showing that defendant ever had mercurial bichloride in her possession, or that in any way she administered poison to Monna Bruner, or that she furnished poison to Frank Bruner that he might administer it to Monna Bruner. The state attempted to introduce statements made by Bruner after the death of his wife. What these statements might disclose we know not, for, upon objection, they were excluded by the trial court.

Bruner was not called as a witness, nor was any witness called from whom defendant purchased poison. If she had purchased it at Gothenburg, it ought to have been shown,

and it will probably be done upon a new trial.    The evidence
is wholly insufficient to sustain the verdict; the judgment is,
therefore, reversed, and the cause remanded.

REVERSED.

DEAN, J., dissenting.

Frank Bruner and Mrs. Arvesta Northey were jointly
informed against by the county attorney of Custer county,
and there charged with having committed murder in the
first degree, by having feloniously administered poison to
Monna Bruner, the wife of defendant Frank Bruner, and
from its effects she shortly thereafter died.    Both defend-
ants were charged as principals pursuant to section 9541
(section 1), ch. 89, Laws 1923, which provides: "Who-
ever aids, abets or procures another to commit any offense
may be prosecuted and punished as if he were the principal
offender."    Mrs. Northey was prosecuted separately.

It seems that this defendant had a talk with V. C. Talbot,
the sheriff of Custer county, and with the county attorney
and the deputy county attorney in the jail after her arrest.
Talbot testified that the county attorney first said this to
defendant:  " 'We feel that you have something more that
you want to tell us that you haven't told us, and if that is
true we are ready to listen,' or words to that effect.    I
couldn't say the exact words.    Q.    What else did she say?
A.    She said that she had told all, she said, 'I have told all I
know about it,' something like that.    Q.    Then what was
said to her?    *    *    *    Yes, and by whom.    A.    Well, I
don't remember exactly what happened just—I know the
county attorney told her that he—he said, 'Now, Mrs.
Northey, you understand that what you say at this time
will be used against you in your hearing, and all we ask of
you is to tell us the exact truth,' and I think she again said,
'I have told you all I know about it;' and about that time
the 'phone rang, and I stepped out to the 'phone and was
out there some little bit, and on my return Mr. Runyan
(deputy county attorney) says, 'Mrs. Northey has said—' "
The following objection was here interposed: Mr. Wilson:
"Wait a minute.    That is objected to as hearsay."    (No

ruling.)   The Court:   "Well, was it said in the presence
of Mrs. Northey? A. It was." The Court: "Answer." (Ex-
ception.)  "A. That Mrs. Northey has admitted giving the—
has said that she gave the tablets to Bruner, and that she
bought them at Gothenburg, Nebraska.   Q. What else was
said there then, and by whom?   A. I (the sheriff) said,
'Now, Mrs. Northey, did you buy these—did you really buy
these tablets at Gothenburg and give them to Bruner?'
And she said, 'I have lied.  I told them that,  *  *  *  I
didn't give them to Bruner, but Bruner wanted me to do
that—Bruner wanted me to tell that.' "

The question arises:   Which of defendant's statements
reflected the truth?   Was it the admission "that she gave
the tablets to Bruner, and that she bought them at Gothen-
burg," or was it the statement that she "lied" when she
"told them that?"   Had the tablets been other than poison,
would defendant have denied giving them to Bruner? To
the jury the denial was doubtless another link in the chain
of proof connecting defendant with the crime.   Counsel
say:   "The denial is more reasonable than the affirmation."
I do not think so.   The affirmation seems to be consistent
with her sworn statement, which follows, and the denial
is not consistent with the statement when the evidence is
considered as a whole.   Anyhow, this was a question of
fact for the jury.   And the trial court's ruling, in effect, so
held.   Clearly, in view of all the evidence, it was for the
jury to pass upon the question as to which of defendant's
statements was true and which was false.   It is elementary
that in the trial of questions of fact, in cases of this class,
it is the duty of the jury to consider all the evidence to-
gether, and not isolated portions of it, and if, when so con-
sidered, the jury is satisfied beyond a reasonable doubt that
the defendant is guilty, its sworn duty is to so find by its
verdict.

December 4, 1924, defendant signed the sworn statement,
which is above referred to, and which was introduced in evi-
dence.   After being read to defendant the statement was
signed by her and verified before the clerk of the district

Northey v. State.

court.    He testified that no person other than affiant and himself were present when it was read and signed and verified, and that no inducement was offered to obtain her signature.    The clerk's statement stands unchallenged. Defendant's statement follows:

"State of Nebraska,} ss.
"County of Custer.  }

"I, Arvesta Northey, being first duly sworn, freely and voluntarily, and without threats or promises of any kind or character and desiring only to tell the truth do make the following statements:   I am forty-seven years of age and reside at Sargent, Nebraska, and have resided there for many years, that I became acquainted with one Frank Bruner a number of years ago and about eight years I have seen him frequently, he visiting me at my home at night and other times and meeting me frequently in stores and other places in Sargent, going riding with me in automobiles, sometimes alone, and sometimes accompanied by my daughter and for some time past he has given me money and some supplies for my home.    About the 5th of September, 1924, Frank Bruner and I by prearrangement met at Grand Island. where I purchased a Ford automobile in which to make a trip.    We stayed in Grand Island together two or three nights and then Frank Bruner and I went in the car alone to Hastings, on to Red Cloud, Nebraska, where we spent the first night.    From Red Cloud, Frank Bruner and I continued our journey in the automobile going down into Kansas, stopping at Beloit and Russell and then following the U. P. Railroad to Denver.    In Denver we stayed one night and part of two days.    We then crossed the mountains and continued our journey going up into Nevada a short distance.    We really planned on going to California but Frank Bruner was afraid that he would be brought back to Sargent, Nebraska, for deserting his family so we decided to return to Sargent, we accordingly turned back and came in the automobile back to Sargent, Nebraska, by the way of North Platte, Gothenburg and

Ansley.  On this journey we camped out staying at tourist parks and other places in towns and cities we visited, and slept in the car.  Frank Bruner paid for part of the expense of this trip and I paid for part of the expense.  On this journey we were gone 21, 22 or 23 days and no one accompanied us on any part of the journey.

"I further state that Frank Bruner and I became very much attached to each other a number of years ago and frequently during the past several years we have sustained illicit relations with each other, and have frequently talked with each other about his securing a divorce from his wife and he has told me that his wife would not agree to a divorce.  He has also told me that he was going to get rid of his wife some way but did not know how, and this statement he made since we returned from the trip in September, 1924.  I told him that my husband would not cause any trouble, he stated that his wife would cause trouble.  About a year ago Frank Bruner suggested to me that I get rid of my husband by slipping a pill into his coffee.  I do not remember whether Frank Bruner discussed with me the subject of poisoning his wife but he has frequently told me that he was going to get rid of his wife and I suspicioned he might poison her.

"Frank Bruner visited me in my home at Sargent, Nebraska, on the Saturday night before his wife died and also on the Sunday night immediately preceding her death the following day.

"On the afternoon of the death of Frank Bruner's wife I was at home alone nearly all the time as my daughter left early in the afternoon and did not return until late.

"Mrs. Arvesta Northey.

"Subscribed and sworn to before me this 4th day of December, 1924.  Herman F. Hanson, Clerk of the District Court of Custer County, Nebraska.  (Seal)"

Following the introduction of the statement in evidence the record proceeds: "Mr. Schnell (examiner): We object to this on the ground that it is not a voluntary statement under all the facts and circumstances in the case.

We further object for the reason that the matters set forth in this instrument have already been testified to and are in evidence in the case. The Court: Overruled. Exception." The record does not seem to sustain the objection of counsel on either point, and it was properly overruled.

Frank Bruner, Mrs. Bruner's husband, was a round-house foreman, or hostler, for the Burlington railroad at Sargent. He worked at night and slept in the daytime. On the day in question, namely, Monday, November 24, 1924, he was at home. At about 3 o'clock on Monday afternoon, the evidence shows that Mrs. Bruner complained that she was ill. About this time in the afternoon, according to the evidence of Addis Monroe, Bruner's fellow employee, Bruner came to the depot and told him that his wife was sick, and in about ten minutes he, Monroe, left the depot and went to Bruner's home shortly after Bruner had arrived there. Upon inquiry, Mrs. Bruner said: "I am awful sick." She told him that she was hanging out the washing when the clothes line fell and when she stooped to pick it up the blood rushed to her head. Monroe then, at her request, took her to Dr. Taylor's office in his car. Before they left, Bruner suggested, "Why not get the doctor down here?" and Mrs. Bruner said, "No, I'll go with Addis." In the meantime Frank Bruner was in the kitchen. He did not go to the doctor's office with his wife. Upon arrival at his office, the doctor prepared some medicine for Mrs. Bruner, and very shortly she returned to the car and started for her home with Monroe. When they had proceeded three or four blocks on their way Mrs. Bruner fainted. Monroe then returned with her to the doctor's office and she was carried in and laid on a couch where she died within a few minutes. Dr. Taylor and two other physicians removed Mrs. Bruner's stomach and it was sent by them to a state chemist at Lincoln. The evidence of the chemist disclosed that the stomach contained a deadly poison. Dr. Taylor named it "a violent poison, an irritant."

It seems that Mrs. Bruner ate no breakfast nor did she partake of any refreshments at the noon hour except a cup

of tea.  Did Bruner, who was at home in the forenoon, surreptitiously drop a poison pill into his wife's tea, or did he, at all, administer the fatal poison to her, in any manner, which was afterward found in her stomach?  And, if so, did defendant aid and abet him, in his murderous deed, within the meaning of section 9541 (section 1), ch. 89, Laws 1923, which is above cited?  If so, both, under the law, are equally guilty.  What is it to "abet" another in the commission of a crime?  Following is an accepted definition: "Abet:  To incite, encourage, or instigate (a person) ;— now used chiefly in a bad sense."  Webster's Dictionary.  Of course, the legislature used the words "aid," "abet," and "procure" in their ordinary sense.

The evidence is, in part, circumstantial.  In their brief defendant's counsel concede this, and also that the state chemist found bichloride of mercury, a deadly poison, in Mrs. Bruner's stomach "in sufficient quantity to produce death."  In 3 Greenleaf, Evidence (16th ed.) sec. 30, it is said:

"The proof of the charge in criminal causes involves the proof of two distinct propositions:  First, that the act itself was done; and, secondly, that it was done by·the person charged, and by none other; in other words, proof of the *corpus delicti*, and of the *identity of the prisoner*.  It is seldom that either of these can be proved by direct testimony; and therefore the fact may lawfully be established by circumstantial evidence, provided it be satisfactory."

Did any witness see Bruner put the poison vial to the lips of his wife or did any witness see or hear his temptress aid and abet him in the act?  No.  Such deeds are not done nor are the plans laid in the presence and hearing of witnesses.  Did Bruner have the will to get rid of his wife?  His paramour, defendant here, says he told her that he did.  Does the evidence show that Bruner and defendant entertained, in common, a felonious desire for Mrs. Bruner's death?  Let the record answer.

It will be recalled that defendant stated in her affidavit that, after she and Bruner had returned to Sargent from

their automobile trip of approximately three weeks, Bruner told her "that he was going to get rid of his wife somehow," and advised her to get rid of her husband, who was past 70, "by slipping a pill into his coffee." Soon afterward defendant abandoned her aged husband and moved away into another house in Sargent.

The motive of defendant, and of Bruner, for the taking of Mrs. Bruner's life seems to have been clearly shown by the circumstances surrounding the entire case. The record plainly shows that the infatuation of defendant and Bruner, each for the other, was altogether mutual. And this was observed by many citizens in the vicinity. The town marshal testified that, after defendant moved away from her husband into another house, she and Bruner were together almost every day. A lady living next door to the house in question testified that Bruner came and stayed there two or three hours at each visit. And many other witnesses testified to the frequency of their unseemly conduct in public places. The notoriously licentious conduct of Bruner and defendant for a period of years, as disclosed by defendant's voluntary statement, and corroborated in part by the evidence of disinterested witnesses, when considered with all of the evidence, tends strongly to establish a common motive and a concerted evil design on the part of both defendant and Bruner to take such steps as were necessary to get rid of Bruner's wife "because she would not agree to a divorce." And this, of course, that these people might marry. True, defendant's husband remained alive. But Bruner advised that his doom be fixed by "slipping a pill into his coffee." Counsel argue: "The important evidence, therefore, upon which conviction must stand or fall, is the testimony of the sheriff and the written statement of the defendant." This plainly concedes that the jury's verdict must stand unless "the testimony of the sheriff and the written statement of the defendant" are both incompetent. And this has not been shown, nor has it been scarcely attempted. Of course, if, in any criminal case, the court should strike out sufficient of "the important evidence" of the state, the prosecution

Northey v. State.

would fail and the defendant would be discharged.   But it was not stricken out, in the present case, nor has it been shown, anywhere, that the evidence as submitted to the jury was incompetent.

Briefly then, what are some other of the main points which tend to support the conviction?   In whose company was defendant on the Saturday night and the Sunday night immediately preceding Mrs. Bruner's death, which fell on the following Monday afternoon?   Let defendant answer: "Frank Bruner visited me in my home at Sargent, Nebraska, on the Saturday night before his wife died and also on the Sunday night immediately preceding her death the following day."   The jury, of course, noted the identity of defendant's nightly visitor; the place where, and the two nights when defendant was "visited" by Bruner at her newly made home away from possible interruption or detection by the husband whom she had recently deserted.   And this intimate relationship, existing for years, no doubt tended strongly to establish in the minds of the jury that it was on the occasion of these last two nocturnal "visits" that the fate of Mrs. Bruner was finally and definitely agreed, upon and fixed, for a day certain, by defendant and her paramour, and that she then and there abetted, that is to say, incited, or encouraged, or instigated Bruner to commit murder.   It is said in defendant's brief:   "The evidence is circumstantial."   Certainly it is so in part.   And the jury were properly instructed in respect of circumstantial evidence.

Counsel argue:   "It must constantly be remembered that Mrs. Northey was not at the Bruner home on the day of her death."   Clearly, in view of the incriminating evidence, defendant knew that Bruners home was no place for her on that day.   But where was she?   In her affidavit she says this:   "On the afternoon of the death of Frank Bruner's wife I was at home alone nearly all the time."   Naturally she would be "at home alone" on that fateful afternoon. Did the jury conclude that defendant was at home waiting for expected tragic "news" from the bedside of the hapless

victim of a poisoner? To this inquiry the record does not supply a vocal answer. And, for obvious reasons, there was none. The poisoner talks to no one other than his accomplice. He makes no boasts. His stealthy tread gives no warning of his approach nor of his departure. He calls no one to witness his cowardly act. With a turn of the hand the poison pill is dropped into the cup of his unsuspecting victim and soon, all is over, except detection. And high heaven hath ordained that a murderer shall not escape his just dues.

In view of all the evidence, could a reasonable juror, under his oath, do otherwise than find defendant guilty? He considers all the evidence. "A voluntary confession of a defendant is competent evidence in a criminal case, and may, with even slight corroborating circumstances, be sufficient to establish the *corpus delicti.*" *Cohoe v. State,* 32 Neb. 744. The present case comes within the rule. *State v. Kennedy,* 77 Ia. 208, is a case where defendant was convicted of the murder of his wife on evidence which was wholly circumstantial. It was held that the verdict could not be interfered with by the supreme court on the ground that the evidence was insufficient. The court, in the present case, cautioned the jury that an admission made out of court is to be "received and considered with caution," and of itself will not support a conviction, but is a circumstance to be considered in connection with other facts.

Applying the language of Wharton to the facts before us, it seems that the strands in the rope of circumstantial evidence, when considered with all the competent evidence submitted to the jury, are "strong enough to establish the guilt of the accused beyond a reasonable doubt." 2 Wharton, Criminal Evidence (10th ed.) sec. 872. The learned author further observes: "When proof has been made of the *corpus delicti* in a homicide prosecution, all facts and circumstances that tend to show motive on the part of the accused are relevant, and equally relevant are the relations between the accused and the deceased, and all feeling that existed between them. * * * Motive in homicide is a

question of fact to be determined by the jury; it may be inferred from the crime itself, or from the actions of the accused. The conduct and attitude of the parties toward each other are circumstances relevant on proof of motive, in connection with the other facts and circumstances surrounding the act." 2 Wharton, Criminal Evidence (10th ed.) secs. 895, 896.

*Siebert v. People,* 143 Ill. 571, is a case where a wife and her paramour were tried for poisoning her husband. The court there held that evidence of adultery was admissible, not for the mere purpose of proving the commission of adultery, but that it was admissible on the question of motive. To substantially the same effect is *Pate v. State,* 94 Ala. 14, where it was held competent, as tending to show motive, for the state to show the fact of adultery by the acts of the parties and the admissions of the defendants.

In *Parrish v. State,* 14 Neb. 60, in an opinion by Lake, J., we said: "It is a presumption of law, applicable in criminal trials, that a person intended to do that which he voluntarily and wilfully did in fact do. * * * If the proof of guilt be of such moral certainty as convinces the minds of the jury, as reasonable men, beyond all reasonable doubt, it is sufficient."

In *Burnett v. State,* 88 Neb. 638, we said: "In a criminal prosecution, the determination of the credibility of witnesses and the weight of the evidence being peculiarly within the province of the jury, a verdict of guilty, based upon sufficient competent evidence, will not be disturbed, even though this court may entertain doubt as to the correctness of the jury's findings."

It is doubtful if a more degrading recital of human depravity has been disclosed in the criminal annals of this state in recent years. Of what avail is the Criminal Code, of what avail are our trial courts and our juries, as deterrents of proved, premeditated murder, if a crime so abhorrent, after a fair and impartial trial, and a verdict pronouncing the guilt of the defendant, based upon sufficient competent evidence, is to go unwhipt of justice?

What is the ultimate object of the enforcement of the law
against murder? Is it for the sake of wreaking vengeance
upon the head of the guilty party? In the last analysis
is it not in large part to warn men, by making an example
of the guilty, that murder shall not go unpunished?

For the reasons herein expressed, I respectfully dissent
from the opinion of the majority. And this on the ground
that, in my judgment, under the evidence and the law ap-
plicable thereto, the verdict of the jury and the judgment
of the learned trial court should have been sustained.